EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico <br> Recurrido <br><br> v. <br><br> José A. Cedeño Laclaustra <br> Peticionario | Certiorari <br><br> 2002 TSPR 111 <br><br> 157 DPR _____ |

Número del Caso: CC-1999-0086


Fecha: 23 de agosto de 2002


Tribunal de Circuito de Apelaciones:
              Circuito Regional VII


Juez Ponente:
              Hon. José L. Miranda de Hostos

Abogados de la Parte Peticionaria:
              Lcdo. Peter Díaz Santiago

Abogado de la Parte Recurrida:
              Lcdo. Carlos M. Calderón Garnier
              Fiscal Especial

              Lcda. Marta Maldonado Maldonado
              Procuradora General Auxiliar

              Secretaria de Justicia de Puerto Rico

Materia: Art. 401 Ley de Sustancias Controladas

Este documento constituye un documento oficial del Tribunal Supremo
que está sujeto a los cambios y correcciones del proceso de
compilación y publicación oficial de las decisiones del Tribunal.
Su distribución electrónica se hace como un servicio público a la
comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Demandante-Recurrido

              v.                          CC-1999-86        Certiorari

José A. Cedeño Laclaustra

    Demandado-Peticionario

Opinión de Conformidad emitida por el Juez Asociado señor Hernández Denton a la que se unen el Juez Presidente señor Andréu García y el Juez Asociado señor Rebollo López

              San Juan, Puerto Rico, a 23 de agosto de 2002.

              Aunque estamos conforme con la Sentencia que hoy emite el Tribunal, mediante la cual revoca el dictamen del foro apelativo y ordena la supresión de la evidencia incautada producto de un registro ilegal, estimamos necesario expresarnos por separado por entender que los registros realizados por los agentes del Negociado de Rentas Internas del Departamento de Hacienda en casos como el de autos violan las garantías constitucionales contra registros irrazonables.

A pesar de que el Tribunal decide no expresarse mediante Opinión sobre el particular, el recurso de epígrafe realmente nos permite

dilucidar si un agente del Negociado de Rentas Internas del Departamento de Hacienda puede registrar mediante una máquina de rayos X, (sin una orden judicial y sin motivo fundado), la maleta de un pasajero al éste desembarcar del avión, con el único propósito de descubrir objetos sujetos a la imposición de arbitrios.

A nuestro juicio, como dicho registro no está relacionado con la seguridad del tráfico aéreo el mismo es irrazonable en violación de la Sección 10 del Artículo II de la Constitución. Por ende, tanto la evidencia que resultó de dicho registro, como la que se procuró a base de información obtenida en el mismo, es inadmisible en un proceso judicial.

## I

En 1998 el Sr. José A. Cedeño Laclaustra arribó a Puerto Rico en un vuelo procedente de Filadelfia, Pennsylvania. Mientras desembarcaba del avión y se dirigía al área de recogido de equipaje, agentes de la Unidad de Inspección Electrónica de Equipaje (un cuerpo especializado del Negociado de Rentas Internas del Departamento de Hacienda) removieron las maletas de todos los pasajeros del avión de la correa de transporte de equipaje y las sometieron a examen por máquinas de rayos X. No surge de los autos que se haya informado a ninguno de los pasajeros de este examen ni que se haya obtenido su consentimiento para llevarlo a cabo. Durante la inspección del equipaje de Cedeño Laclaustra, uno de estos agentes, José Burgos Guzmán, percibió dos (2) "bultos" en la maleta que le parecieron "material tributable". Acto seguido, los agentes tomaron fotografías de las maletas de Cedeño Laclaustra y las colocaron nuevamente en la correa de transporte. Burgos Guzmán se dirigió entonces al área de recogido de equipaje, dónde también se encontraban otros cuatro (4) agentes de Rentas Internas.

Cuando Cedeño Laclaustra recogió su equipaje para salir del aeropuerto fue intervenido por uno o más agentes de Rentas Internas.

Ya en este momento, según declaró el agente Burgos Román bajo juramento, él se encontraba detenido y no estaba en libertad para irse del lugar. Burgos Román le indicó que su detención respondía a una inspección de rutina y, acto seguido, le preguntó qué llevaba en las maletas. Manifestó el agente que Cedeño Laclaustra le respondió que llevaba marihuana. Esta declaración provocó que Burgos Román le ordenara a Cedeño Laclaustra abrir su maleta. El peticionario acató la orden permitiendo que los agentes incautaran dos (2) paquetes cerrados, envueltos en plástico negro. Sólo entonces, los agentes le hicieron las advertencias legales a Cedeño Laclaustra y formalizaron su arresto. Luego de realizar una prueba de campo de los paquetes incautados, se reveló que los mismos contenían marihuana.

Por estos hechos se presentó acusación contra José A. Cedeño Laclaustra por violación al Art. 401 de la Ley de Sustancias Controladas, Ley Núm. 4 del 23 de junio de 1971, según enmendada, 24 L.P.R.A. sec. 2401 *et seq.* Celebrada la vista preliminar, el Tribunal de Primera Instancia determinó que no existía causa probable para acusar a Cedeño Laclaustra de los delitos imputados, por habérsele violado el debido proceso de ley. El Ministerio Público acudió en alzada y obtuvo una determinación favorable para acusar por infracción al referido artículo.

Oportunamente, Cedeño Laclaustra presentó una moción de supresión de evidencia en la que adujo que la sustancia controlada incautada por los agentes del Negociado de Rentas Internas del Departamento de Hacienda era producto de un registro ilegal, por lo que no debía

admitirse en evidencia. Planteó, en lo aquí pertinente, que el registro electrónico se realizó sin orden judicial ni causa probable; que perseguía un propósito penal y no administrativo; que los agentes de Rentas Internas no tenían la autoridad legal para llevarlo a cabo; que la detención posterior que se realizó fue ilegal; y que no se le habían hecho las advertencias sobre sus derechos, según requerido por la jurisprudencia.

El tribunal de primera instancia declaró sin lugar la moción de supresión de evidencia, por lo que Cedeño Laclaustra acudió en revisión al Tribunal de Circuito de Apelaciones. El foro intermedio denegó el recurso al concluir que éste había consentido válidamente a un registro administrativo.

A solicitud del acusado, esta Curia expide el auto de Certiorari y mediante Sentencia revoca el dictamen recurrido y ordena la supresión de la evidencia incautada. Aunque estamos de acuerdo con este curso de acción, estimamos prudente expresarnos por separado en vista de la importancia de la controversia planteada ante nos. Veamos.

## II

De entrada, valga aclarar que los registros que realizan los agentes de la Unidad de Inspección Electrónica de Equipaje del Departamento de Hacienda en el equipaje de los pasajeros que desembarcan en los aeropuertos del país se rigen por un "Procedimiento"[1], amparado a su vez en las secciones 6140(a)2 y 9 del

---

[1] El mismo es un procedimiento interno de la Unidad de Inspección de Equipaje establecido para los agentes que intervienen con el equipaje en los aeropuertos. Véase, Anejo IV del Informe del Procurador ante nos.

Código de Rentas Internas, 13 L.P.R.A. secs. 8140(a)2 y 9. Las mismas

disponen, en lo pertinente:

(a) A los fines de la aplicación y administración de esta

Parte, y en adición a cualesquiera otros deberes y poderes
establecidos en el mismo, se faculta al Secretario para:

[…]

(2) Inspeccionar el equipaje y los artículos
introducidos en Puerto Rico por viajeros procedentes del
exterior cuando haya razones para creer que se están
introduciendo **artículos sujetos al pago de impuestos** fijados
en la Parte IV. Esta inspección o examen podrá verificarse
en cualquier momento sin que para ello sea necesario el
consentimiento del viajero, consignatario de la persona que
reclama la propiedad de dichos artículos o del porteador de
los mismos.

[…]

(9) Arrestar a cualquier persona que sea sorprendida en
el acto de violar alguna disposición de la Parte IV o de sus
reglamentos e interrogar a dicha persona y conducirla ante
el magistrado competente para la acción judicial que
corresponda. (Énfasis suplido).

Estas disposiciones se reproducen en el Art. 8.001(2) y (9), del

Reglamento Núm. 3890 del Departamento de Hacienda.

El "Procedimiento" de la Unidad de Inspección Electrónica de

Equipaje, a su vez, ordena la inspección **automática, sin causa probable**

**o motivo fundado y sin orden judicial** de todo el equipaje de pasajeros

que arriban a la Isla provenientes de los Estados Unidos.[2]  De este

texto surge que uno de los propósitos principales, aunque no el único,

de la Unidad de Inspección Electrónica de Equipaje es la detección de

material delictivo que traen los viajeros de los Estados Unidos.  Los

---

[2] Este dispone, en lo pertinente:

"[...] (2) Inspección de Vuelos
    Una vez seleccionado un vuelo para inspección y
comenzada la misma SE INSPECCIONARÁ TODO EL EQUIPAJE
incluyendo aquellos [sic] que van para los Cruceros."

efectivos de la Unidad, como agentes de Rentas Internas, son agentes del orden público con facultad para arrestar por disposición expresa del Código de Rentas Internas, 13 L.P.R.A. sec. 8147. Estos agentes gozan de un carácter **dual**. No son sólo funcionarios administrativos, sino que además son funcionarios del orden público.

Más aún, las violaciones a las disposiciones tributarias del Código de Rentas Internas en materia de arbitrios constituyen delito en sí mismas. Así lo disponen las secs. 6087 a la 6096, 13 L.P.R.A. secs. 8087 a la 8096. Reza la sec. 6087:

> "Toda persona que no cumpla con cualquier disposición de la Parte IV [Arbitrios] o de los reglamentos promulgados en virtud del mismo, o con cualquier otra ley o reglamento de Puerto Rico relacionado con impuestos de rentas internas, o que a sabiendas coopere, induzca, o de otro modo ayude a una persona a violar las leyes y reglamentos mencionados incurrirá en un delito menos grave y convicta que fuere será castigada con la penalidad establecida en la sec. 6094 de esta Parte, a menos que específicamente se disponga otra pena en esta Parte." (Énfasis suplido).

A la luz de estas disposiciones, cabe formular la siguiente interrogante, ¿resulta valido el registro inicial al que fue sometido el equipaje de Cedeño Laclaustra a través de la maquina de rayos X sin que mediara causa probable o motivo fundado de que éste presentara un riesgo de seguridad específico, inmediato y discernible a la protección del aeropuerto? Veamos.

**III**

A

_____

(Mayúsculas en original). Anejo IV, pág. 10 del Informe del

La Constitución del Estado Libre Asociado de Puerto Rico consagra en la Sección 10 de su Carta de Derechos la protección contra los

registros y allanamientos irrazonables. La Cuarta Enmienda a la Constitución de los Estados Unidos hace lo propio en el foro federal y es además aplicable a Puerto Rico. Torres v. Puerto Rico, 442 U.S. 465 (1973). En síntesis, ambos textos disponen, en lo pertinente, que al Estado le está prohibido realizar registros irrazonables de la persona, morada y propiedad de los ciudadanos, a riesgo —explícito en nuestra Constitución y derivado en la federal— de que la evidencia que obtenga de estos registros sea inadmisible en los tribunales. Const. E.L.A., Art. II, Sec. 10; Const. E.U.A., Enm. IV.

Nuestra Constitución no es óbice para todo registro efectuado por el Estado, sino sólo para aquellos que sean irrazonables. Pueblo v. Ferreira Morales, res. el 10 de diciembre de 1998, 98 TSPR 165. No obstante, los registros realizados sin orden judicial se presumen irrazonables, y es responsabilidad del Estado probar su razonabilidad.

Esta presunción se aplica tanto a los registros de naturaleza penal, como a los administrativos. E.L.A. v. Coca Cola Bott. Co., 115 D.P.R. 197, 207 (1984). Aunque, de ordinario, los registros administrativos exigen un estándar de causa probable menos riguroso que los registros penales, mientras adquieran más visos de carácter penal, más se aproximarán ambos estándares. E.L.A. v. Coca Cola Bott. Co., supra, pág. 213.

La jurisprudencia de este Tribunal y de los tribunales federales ha concluido que el examen de individuos y equipaje en los aeropuertos por medios electrónicos **constituye un registro**. Pueblo v. Bonilla

_____

Procurador ante nos.

Bonilla, res. el 7 de octubre de 1999, 99 TSPR 151; United States v. Henry, 615 F.2d 1223 (9th Cir. 1980); United States v. $124,570 U.S. Currency, 873 F.2d 1240 (9th Cir. 1989); United States v. Davis, 482 F.2d 893 (9th Cir. 1973). Ver además LaFave, Search and Seizure, sec. 10.6(e), Vol. 4, pág. 639 (1996). Esto, por virtud de la expectativa razonable de intimidad que tiene un viajero sobre el contenido de su equipaje. United States v. Davis, supra, págs. 904-05; Bond v. United States, 68 U.S.L.W. 4255, 4256 (2000). Dicha expectativa es aún mayor en el equipaje de carga ("checked luggage") que en el de mano ("carry-on luggage"). LaFave, supra, pág. 641.

Por lo tanto, procede afirmar que la inspección del equipaje de Cedeño Laclaustra mediante equipo de rayos X fue un registro en el sentido constitucional. Nos resta evaluar, entonces, si fue constitucionalmente razonable, y si se dieron las circunstancias que justifican prescindir de una orden judicial.

B

La razonabilidad de los registros en aeropuertos depende, en primera instancia, de la finalidad que se persigue al realizarlos. Este postulado se deriva, precisamente, del criterio general que ha sido aplicado por la Corte Suprema de los Estados Unidos a registros y allanamientos en los que no existe sospecha razonable individualizada de conducta criminal. Indianapolis v. Edmond, 531 U.S. 32 (2000).

La validez de los registros de equipaje realizados en aeropuertos —fuere mediante equipo de rayos X, magnetómetro o registro físico—, para enfrentarse al terrorismo aéreo ha sido examinada extensamente por la jurisprudencia federal. Estas intromisiones, se ha dicho, están justificadas como parte de un "designio reglamentario general" que

persigue un fin específico: **la prevención del terrorismo aéreo.**
United States v. Davis, supra, pág. 908. Dicho propósito justifica

un registro enfocado directamente en la detección de armas y explosivos
en el equipaje de mano al momento de abordarse un avión. Los hechos
ocurridos el 11 de septiembre de 2001 claramente demuestran la
necesidad que tiene el Estado de hacer registros de estos equipajes
al momento de abordar los aviones para garantizar la seguridad de los
pasajeros que utilizan la transportación aérea diariamente.

Sin embargo, un registro ilimitado al momento de recoger las
maletas después de concluido el viaje, **que no tiene el propósito de
garantizar la seguridad de la transportación aérea ni guarda relación
alguna con el problema de terrorismo y que solamente busca identificar
artículos tributables que los pasajeros traen a Puerto Rico, es
intolerable constitucionalmente.** A tales efectos, en United States
v. $124,570 U.S. Currency, supra, pág. 1243, se señaló que:

> **On the other hand, lawful airline searches of carry-on
> luggage may not be enlarged or tailored systematically to
> detect contraband (e.g. narcotics) unrelated to airline
> security.**
>
> […] **The government neither cites, nor have we found, any case
> upholding a warrantless administrative search for
> contraband unrelated to airline security concerns, absent
> exigent circumstances, consent, a finding of 'virtual
> certainty,' or some other recognized exception to the
> warrant requirement.** United States v. Doe, 61 F.3d 107, 110
> (1995). (Citas omitidas, énfasis suplido)

Precisamente, la jurisprudencia federal ha delimitado grandemente el
alcance de estas intromisiones para así evitar el tipo de registro
general e indiscriminado que realizaron los agentes de la Unidad de
Inspección Electrónica de Equipaje en el caso de autos. Así, cuando
los distintos foros judiciales han validado registros en aeropuertos,

y situaciones similares, sin mediar orden judicial, no lo han hecho
basándose en una distinción talismánica entre registros

administrativos y registros penales.  Más bien, el corazón mismo de
la justificación que valida un registro sin orden judicial lo es el
fin específico que persigue.   "[P]urpose is often relevant when
suspicionless intrusions pursuant to a general scheme are at issue."
Edmond, supra.  La cuestión de verdadera importancia no es si ese fin
es penal o administrativo, sino si el registro es **necesario** para
promover un **interés gubernamental apremiante**.  Esto surge claramente
de Davis, supra, al decir: "Moreover, exercise of the constitutional
right to travel may not be conditioned upon the relinquishment of
another constitutional right (here the Fourth Amendment right to be
free of unreasonable search), **absent a compelling state interest**."
Davis, supra, en la pág. 913 (énfasis suplido).  Así pues, lo que
estamos haciendo es aplicando un escrutinio estricto cuando se intenta
validar una excepción a la protección constitucional contra registros
sin orden judicial.[3]

En términos más específicos, podemos observar que los registros
de tipo rutinario sin orden judicial que han validado los tribunales
federales, están todos predicados en un interés apremiante de proteger

---

[3] Véase, Thirtieth Annual Review of Criminal Procedure, 89 Geo. L.J. 5, en las págs. 1156-1157 (2001) ("In determining whether such a dispensation is justified, courts evaluate whether the government interest claimed to support the warrantless search is a "special need... beyond the normal need for law enforcement" that would be jeopardized through the individualized suspicion requirement normally applicable to searches.  To be considered a special need, a government interest must address a real, current, "vital" problem that can be addressed effectively through the proposed search.  Even if a special need is present, however, it must still be balanced against the privacy interest at stake and the character of the intrusion.   The

la salud y/o la seguridad pública.  Más aun, todos estos casos tienen en común que lo que se persigue es la **prevención de un daño irreparable**

**e inminente** que puede ocurrir **como consecuencia directa y prácticamente inmediata** de la conducta ilícita que se pretende detener.  Esta proximidad tanto en **tiempo** como en **cadena de causalidad**, es un factor fundamental de las excepciones que, por la protección de la salud y seguridad pública, se han hecho al requisito de orden judicial.

Así pues, en U.S. v. Schafer, 461 F.2d 856 (9th Cir. 1972), el Noveno Circuito validó el registro del equipaje de los pasajeros saliendo de Hawaii para prevenir la exportación de enfermedades y pestilencias.[4]  En ese caso, pues, estaba en juego la salud pública y el control de posibles epidemias de proporciones verdaderamente catastróficas. Por otra parte, en Downing v. Kunzig, 454 F.2d 1230 (6th Cir. 1972), se validó el registro de los maletines de las personas que **entraban** a un edificio federal para asegurarse que no contuvieran armas ni explosivos.  Véanse además, U.S. v. Biswell, 406 U.S. 311 (1972) (vendedores de armas de fuego); Camara v. Municipal Court, 387 U.S. 523 (1967) (interés de salud y seguridad pública encarnado en un código de vivienda); y See v. City of Seattle, 387 U.S. 541 (1967) (código de fuego).

De igual manera, en Davis, supra, el gobierno perseguía el interés apremiante de prevenir la piratería aérea.  "The essential purpose of the scheme is not to detect weapons or explosives or to apprehend those

---

determination of whether special needs searches are permissible consequently is heavily fact- and case-specific.") (Citas omitidas).

[4] Cabe destacar que Schafer, supra, es distinguible del caso de autos también porque los registros se conducían **antes** que la persona embarcara al avión.

who carry them, but to deter persons carrying such material from seeking to board at all." Davis, supra, en la pág. 908. La importancia y

gravedad del problema de la piratería y el terrorismo aéreo justificaban la excepción en Davis, supra. "The need to prevent airline hijacking is unquestionably grave and urgent. The potential damage to person and property from such acts is enormous. The disruption of air traffic is severe. There is serious risk of complications in our foreign relations." Id. en la pág. 910. Por esto, se autorizó un registro limitado a armas y explosivos.

Sin embargo, esta justificación no está presente en el caso de autos. Como hemos mencionado, el mismo **no tiene nada que ver con piratería de aviones ni la seguridad aérea. De hecho, Cedeño Laclaustra no cuestiona la facultad del Estado de hacer registros de equipaje antes de que los pasajeros aborden los aviones. Tampoco cuestiona el interés apremiante que tiene el Estado para tomar medidas cautelares para garantizar la seguridad aérea, particularmente contra el terrorismo. Lo único que aquí se impugna es el registro indiscriminado del Departamento de Hacienda de un equipaje al momento de desembarcar un pasajero con el propósito de detectar la importación de artículos sujetos a arbitrios en Puerto Rico.**

Como se indicó en U.S. v. $124,570 U.S. Currency, supra a la pág. 1243: "While narrowly defined searches for guns and explosives are constitutional as **justified by the need for air traffic safety**, [...] a generalized law enforcement search of all passengers as a condition for boarding a commercial aircraft would plainly be unconstitutional." Así, la excepción al requisito de orden judicial no es aplicable en

casos en donde, en vez de un interés de seguridad o salud pública inmediato, lo que se intenta promover es un **interés generalizado de**

**combatir la introducción de artículos sin pagar arbitrios**. Esta distinción surge claramente de la trilogía de casos de Torres, supra; Michigan v. Sitz, 496 U.S. 444 (1990); y Edmond, supra. Veamos.

En Sitz, supra, el Tribunal Supremo de Estados Unidos validó un sistema de bloqueos rutinarios para detectar conductores en estado de embriaguez. En síntesis, el Tribunal en Sitz, supra, entendió que el interés apremiante de mantener a los conductores ebrios fuera de las carreteras, unido a la alta efectividad del método empleado, sobrepasaba la leve intromisión en la privacidad de los conductores.

En primer lugar, debemos observar que en este caso el Tribunal entendió que existían **"special government needs, beyond the normal need for law enforcement."** Sitz, supra, en la pág. 449 (énfasis suplido). La gravedad del problema de los accidentes provocados por conductores ebrios fue el eje central que creaba una justificación para la intromisión. Sitz, supra, en la pág. 451 citando Breithaupt v. Abram, 352 U.S. 432, 439 (1957). Por el contrario, la situación en el caso de autos es muy diferente. Se nos hace difícil pensar que el interés de recaudar arbitrios sobre aquella propiedad que traen los pasajeros a Puerto Rico es de un carácter tan apremiante como el de salvar las vidas de los pasajeros de ataques terroristas o de conductores inocentes y sus familias. Además, el propósito de detener a los conductores ebrios es evitar ese **daño irreparable inminente a la salud y seguridad pública** al no dejarlos seguir conduciendo. Por último, la intromisión a la privacidad de los pasajeros, al someter todas sus maletas a un registro cuando desembarcan, es mucho mayor y menos

efectiva para descubrir contrabando que el procedimiento llevado a cabo en Sitz, supra, para identificar conductores ebrios.

En este punto cabe mencionar el argumento que hace el Procurador General ante nos en cuanto a lo apremiante que es el interés del Estado de poder recaudar impuestos. Si bien es cierto que un gobierno sin dinero no puede funcionar, también es cierto que existen innumerables maneras para recaudarlo. Registrar a todos los pasajeros que llegan a Puerto Rico no es un medio **necesario** para la supervivencia fiscal del Estado. Además, el porcentaje de arbitrios que se recaudan de pasajeros es mínimo comparado con la cantidad que se recauda de la importación comercial de productos. Esta cantidad es aun más minúscula al compararla con el presupuesto total del Gobierno de Puerto Rico. Como tal, la efectividad que tienen los registros en los aeropuertos efectuados por los agentes de rentas internas al promover el interés del gobierno de adquirir recursos para su funcionamiento es verdaderamente ínfima.

Por otra parte, en Edmond, supra, el Tribunal Supremo de Estados Unidos recientemente invalidó unos bloqueos en las carreteras similares a los bloqueos en Sitz, supra. La diferencia fundamental es que en este caso, los bloqueos tenían el propósito de encontrar drogas y no conductores ebrios. El Tribunal reiteró la norma de que un registro es ordinariamente irrazonable en ausencia de una sospecha individualizada. Edmond, supra. Repitió, además, que se han validado algunos regímenes de registros sin sospecha individualizada cuando existe una necesidad especial, más allá de la necesidad normal de combatir el crimen. Id. Lo importante, sin embargo, es que el Tribunal hizo claro que "[i]n none of these cases, however, did we

indicate approval of a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." Id. Así pues,

el Tribunal distinguió los registros en Edmond, supra, porque buscaban promover un interés generalizado de combatir el crimen aclarando que si se permitiese la creación de tales bloqueos para promover dicho interés: "the Fourth Amendment would do little to prevent such intrusions from becoming a rutine part of American life." Id.

Como mencionáramos anteriormente, el caso de autos no presenta ninguna situación de emergencia, ni el interés del Estado por recaudar arbitrios se puede catalogar como un interés apremiante. Mas bien, se trata de un interés generalizado del Estado de hacer cumplir las leyes o combatir el crimen de contrabando. Por tanto, la limitación de Edmond, supra, es directamente aplicable.

Por último, tal vez el caso más similar al de autos es Torres, supra. En esa ocasión, el Tribunal Supremo de los Estados Unidos declaró inconstitucional una ley local que autorizaba a agentes del orden público a registrar las maletas de los pasajeros que desembarcaban aviones en Puerto Rico con el propósito de ocupar armas, explosivos y contrabando. Torres, supra. La única diferencia, pues, entre ese caso y el de autos es que en esa ocasión los funcionarios envueltos eran agentes del Negociado de Investigaciones Criminales **buscando drogas, armas o explosivos**; mientras que en el caso de autos los funcionarios eran agentes de rentas internas buscando cualquier tipo de mercancía que no hubiese rendido arbitrios, es decir, **cualquier tipo de contrabando**. Esta distinción nos parece inmaterial.

Por su parte, el Tribunal en Torres, supra, precisamente distinguió entre los registros destinados a proteger la seguridad y

salud pública y aquellos encaminados a combatir el crimen.  Id. en la pág. 473. **"Use of airport metal detectors with respect to passengers boarding aircraft and searches of persons entering military bases involve considerations not relevant to this case."**  Id. en la pág. 473, n. 5. (Énfasis suplido).  Una vez más el Tribunal catalogó los registros en Torres, supra, bajo el propósito general de combatir el crimen y como tal sujetos a los requisitos de la Cuarta Enmienda.

Valga resaltar que en dicho caso el Estado también argumentó que "its law enforcement problems are so pressing that it should be granted an exemption from the usual requirements of the Fourth Amendment."  Id. en la pág. 473.  El Tribunal, sin embargo, rechazó tal conclusión y expuso: "we have not dispensed with the fundamental Fourth Amendment prohibition against unreasonable searches and seizures simply because of a generalized urgency of law enforcement".  Id. en la pág. 474.

Entendemos que el caso de autos es similar a Torres, supra, y a Edmond, supra.  El propósito fundamental de los registros en el presente caso es ejecutar la ley de arbitrios y capturar a sus evasores. Este interés generalizado, que no implica ningún tipo de amenaza inminente ni a la salud ni a la seguridad pública, está plenamente sujeto a los requisitos tanto de la Cuarta Enmienda de la Constitución de los Estados Unidos como a los de la Sección 10 del Artículo II de nuestra Constitución.

Cabe además mencionar, por último, que Davis, supra, y los demás casos que validaron los registros de equipaje en aeropuertos no sólo eran registros de pasajeros al momento de abordar, sino que además eran registros de equipaje de mano ("carry-on").  "[I]t must be emphasized that the procedures just discussed are applicable to carry-on items

only, and are not permissible as to checked luggage." LaFave, supra, sec. 10.6(e). Así pues, en U.S. v. Palazzo, 488 F.2d 942 (5th Cir.)

se resolvió que un registro sin orden judicial del equipaje de carga ("checked luggage)" de los pasajeros no era válido en ausencia de "exigent circumstances." "[N]o anti-skyjacking necessity remained that would authorize the search of the baggage which had been checked at a remote point and was no longer in the possession or under the control of the suspects." Id. en la pág. 946. Esto no quiere decir que el equipaje de carga ("checked luggage") nunca puede ser registrado, pero sí significa que en ausencia de amenaza a la seguridad o salud pública, no es valido constitucionalmente un registro sin orden judicial o motivos fundados.

C

De otra parte, tampoco la teoría del registro administrativo de un negocio estrechamente reglamentado justifica un registro de equipaje al momento de desembarque. Primeramente, debemos aclarar que esta excepción está diseñada para aplicar a los comercios estrechamente reglamentados. Ferreira Morales, supra. Como tal, a lo que se refiere es a los registros que de dichos establecimientos y papeles comerciales haga el gobierno. Id. en la pág. 6. Bien sabido es que la protección que se puede extender a la privacidad en los asuntos de negocio de un individuo es menor a la que se le extiende al mismo individuo en su faceta personal. En este sentido, aunque concluyéramos que una línea aérea cae bajo la excepción de una industria estrechamente reglamentada, esto le permitiría a las agencias competentes hacer registros rutinarios de, por ejemplo, los motores de los aviones y los récords de seguridad de la compañía. Por otra parte, no le daría acceso

a dichas agencias a los efectos personales de los pasajeros. El que se expone a los registros en una industria estrechamente regulada es

el propietario y la entidad jurídica, no los clientes. Id. Así pues, el Departamento de Salud podría hacer inspecciones rutinarias de las cocinas de los restaurantes bajo su jurisdicción, pero no de las carteras y bolsillos de todos los que estén cenando en el lugar.

Además, esta excepción constituye, realmente, una variante de la excepción por salud y seguridad pública que discutiéramos anteriormente. "De ordinario, una industria o actividad comercial es objeto de particular atención por el aparato estatal [y está sujeta a la excepción de industria estrechamente regulada] cuando la actividad realizada incide de manera significativa sobre la seguridad o salud pública." Id. en la pág. 6 (énfasis suplido). "Es preciso examinar la naturaleza de la industria en cuestión para determinar si su operación incide sobre la seguridad y salud pública." Id. en la pág. 7.

Los intereses legítimos del Estado con respecto a la industria del transporte son la preservación de la seguridad y la salud pública, no el recaudo de arbitrios o la detección de narcóticos en los aeropuertos. Estas actividades del Estado son ajenas a la reglamentación de dicha industria. Ciertamente, la operación de una aerolínea cumple con los requisitos de un negocio altamente reglamentado, pero no así el uso, en calidad de cliente, de los servicios de la misma. El nivel de escrutinio al que está sujeto el transportista no se transfiere al consumidor.

De todas maneras, interpretar el registro electrónico al que fue sometido el equipaje de Cedeño Laclaustra como un mero registro

administrativo también obvia el propósito palmario de la incautación. En el caso de autos, los hechos demuestran que el registro electrónico

de equipaje tiene un fin tanto penal como tributario.

D

Existe, sin embargo, una excepción reconocida por la jurisprudencia en que se permite el registro de la persona y equipaje de un pasajero al momento de desembarque, sin causa probable ni orden judicial; el denominado "registro de frontera". Dichas intervenciones están justificadas por el derecho a controlar la entrada (y salida) de personas y mercancías al territorio de un país soberano.

La facultad de realizar un registro de frontera es inherente al ejercicio de la soberanía y busca proteger la integridad territorial del Estado. Torres v. Puerto Rico, supra, págs. 472-73. De este modo, se justifican los registros para fines de inmigración y aduana, *inter alia*, tanto en las fronteras físicas de un país como en las llamadas "fronteras constructivas", como son los lugares de llegada de vuelos internacionales, aunque se encuentren en el interior del territorio. LaFave, supra, sec. 10.5(a), pág. 530, et seq.

Sobre la aplicación del registro de frontera a los vuelos interestatales entre Puerto Rico y los Estados Unidos, la Corte Suprema Federal ha expresado claramente que las fronteras geográficas de Puerto Rico no son fronteras políticas en relación a los bienes y personas que provienen de los Estados Unidos. Sostuvo la Corte Suprema en Torres v. Puerto Rico, supra, págs. 472-73,

> The authority of the United States to search the baggage of
> arriving international travelers is based on its inherent
> sovereign authority to protect its territorial integrity.
> By reason of that authority, it is entitled to require that
> whoever seeks entry must establish the right to enter and
> to bring into the country whatever he may carry. Puerto Rico

has no sovereign authority to prohibit entry into its territory; as with all international ports of entry, border and customs control for Puerto Rico is conducted by federal officers. Congress has provided by statute that Puerto Rico must accord to all citizens of the United States the

privileges and immunities of its own residents. (Citas omitidas, énfasis suplido)

Los registros que lleva a cabo la Unidad de Inspección Electrónica de Equipaje en los aeropuertos del país son esencialmente iguales a los que la Corte Suprema de los Estados Unidos invalidó en Torres, supra: registros indiscriminados, sin requisito de orden judicial o motivo fundado, realizados por agentes del orden público para detectar, inter alia, materiales y efectos cuya posesión es constitutiva de delito. Tales registros sólo serían constitucionalmente tolerables si se realizaran en una frontera internacional. La Corte Suprema de los Estados Unidos ha hecho claro, sin embargo, que la "frontera" entre Puerto Rico y los estados federados es interestatal.

El Estado Libre Asociado de Puerto Rico, no obstante su relación política con los Estados Unidos, no tiene la autoridad necesaria en materia de fronteras y aduanas para someter a los viajeros de los Estados Unidos a registros indiscriminados sin que medie causa probable u orden judicial.[5] Como sostiene Cedeño Laclaustra ante nos, la creación de la "Aduana Criolla" que pretende el Departamento de Hacienda le está vedada.

**IV**

A tenor con la normativa descrita anteriormente es evidente la inconstitucionalidad del registro electrónico del equipaje de Cedeño Laclaustra en el caso de autos. Dicha actuación ilegal, (esto es, el registro inicial de su equipaje mediante el equipo de rayos X), anula

todas las intervenciones posteriores con su persona y propiedad, ya que desprovee de un legítimo motivo fundado la posterior detención de

Cedeño Laclaustra, el interrogatorio que le hiciera el agente de la Unidad de Inspección Electrónica de Equipaje, el registro manual de su maleta y la prueba de campo a la que se sometió la sustancia allí encontrada.

Más aún, el "Procedimiento" de intervención de la Unidad de Inspección Electrónica de Equipaje, por las mismas razones que configuran su inconstitucionalidad, rebasa la autoridad del Secretario de Hacienda según expuesta en la sección 6140(a)2 de la Ley de Rentas Internas, 13 L.P.R.A. sec. 8140. Los efectivos del Departamento de Hacienda que deseen inspeccionar electrónicamente el equipaje de un viajero que arriba a Puerto Rico han de tener "razones para creer que se están introduciendo artículos sujetos al pago de impuestos". Véase, 13 L.P.R.A. sec. 8140(a)2. Dichas razones deben equivaler a motivos fundados. Sin embargo, ¿qué motivo fundado tiene la Unidad de Inspección Electrónica de Equipaje para someter todo bulto, maleta o paquete que entre a la Isla a una inspección electrónica? Evidentemente, ninguno. En consecuencia, las razones que justifican las inspecciones físicas son inválidas por surgir exclusivamente de inspecciones electrónicas previas realizadas sin motivo fundado alguno.

Recordemos, de los hechos narrados anteriormente, que al momento de llegar a Puerto Rico, Cedeño Laclaustra no había dado ningún motivo aparente para justificar una intervención con su persona. Es el

_____

[5] Ya antes el Estado ha sido advertido de este hecho en la Opinión del Secretario de Justicia Núm. 21 del 20 de mayo de 1987.

registro de su maleta mediante rayos X por el agente Burgos Guzmán lo que levanta sospechas sobre la posibilidad de contrabando en su

equipaje. La maleta en cuestión fue fotografiada y varios agentes se desplazaron para identificar e intervenir con quien la recogiera. Al tomarla el peticionario, los agentes de Rentas Internas le cuestionaron sobre su contenido, del que sólo tenían conocimiento a través del registro electrónico que habían realizado. Tanto las preguntas hechas a Cedeño Laclaustra como la orden de abrir su equipaje perseguían identificar la naturaleza de los "bultos" percibidos durante el registro electrónico. No surge de los autos razón alguna, independiente del registro electrónico, que hubiera llevado a los agentes de Rentas Internas a sospechar de Cedeño Laclaustra o despertado su curiosidad por el contenido de su equipaje.

Al ser ilegal el registro electrónico de la maleta del peticionario, todas las acciones posteriores que se basaron en el resultado de ese registro son "frutos del árbol ponzoñoso"; evidencia cuya obtención se deriva de una acción ilegal del Estado. Al explicar esta doctrina, la Profesora Resumil señala:

> "No solamente la evidencia directa o primaria obtenida por medio de un procedimiento constitucionalmente viciado y dirigido a su obtención es susceptible de ser excluida. **La aplicación de la regla de exclusión se extiende también a evidencia obtenida como resultado de la explotación de una intervención inconstitucional bajo las disposiciones que protegen el derecho del pueblo a la protección contra arrestos, registros y allanamientos irrazonables.**" Resumil, <u>Derecho Procesal Penal</u>, Tomo I, pág. 306 (1990) (Énfasis suplido)

La doctrina del "fruto de árbol ponzoñoso" fue recientemente adoptada de forma explícita por este Tribunal. <u>Pueblo</u> v. <u>Serrano Cancel</u>, <u>supra</u>; <u>Pueblo</u> v. <u>Miranda Alvarado</u>, 143 D.P.R. 356 (1997). No

obstante, se exceptúa de la regla de exclusión la evidencia derivada, fruto de una ilegalidad de los agentes del Estado, si la evidencia

habría sido descubierta inevitablemente, si una fuente independiente habría justificado su detección o si el vínculo entre la ilegalidad y la obtención de la evidencia era vago o atenuado. LaFave, _supra_, sec. 11.4(a), págs. 234, _et seq._

Ninguna de estas excepciones puede invocarse en el caso de autos. No surge del récord ninguna razón, independiente al primer registro ilegal, que hubiere dado causa a los agentes de la Unidad de Inspección Electrónica de Equipaje para intervenir con Cedeño Laclaustra. A todas luces, nunca hubieran intervenido con Cedeño Laclaustra de no levantarse sus sospechas a raíz de la inspección electrónica de sus maletas. No hay prueba alguna de que Cedeño Laclaustra exhibiera conducta sospechosa, que el contenido de su maleta se hubiere detectado por otro medio que el electrónico, que se hubiere alertado a los agentes del orden público de dicho contenido o que hubiere una política de interrogar a todos los pasajeros, independientemente del resultado del registro electrónico, sobre el contenido de su equipaje.

No se requiere un argumento complejo y sofisticado para establecer el vínculo entre el registro electrónico y la intervención con Cedeño Laclaustra. Las acciones de la Unidad de Inspección Electrónica de Equipaje estuvieron siempre encaminadas a la identificación del contenido del equipaje del peticionario. La única razón para acercarse a Cedeño Laclaustra y preguntarle qué llevaba en su maleta fue el resultado del registro electrónico inconstitucional. Como tal, la evidencia obtenida posteriormente estaba irremediablemente viciada por la inconstitucionalidad del registro inicial y debió ser suprimida.

La violación al derecho del acusado de no ser sujeto a registros irrazonables nos lleva a estar conforme con la revocación de la

sentencia recurrida. Enfatizamos, además, que esta acción es parte de un operativo de registros aduaneros inconstitucionales cuya cotidianidad consuma aún más la erosión de los derechos de los viajeros que arriban a esta Isla.

Por las razones expresadas anteriormente, invalidaríamos por inconstitucional el registro llevado a cabo por la Unidad de Inspección Electrónica de Equipaje por tratarse de un registro sin motivos fundados ni orden judicial y carente de un interés apremiante del Estado. Por ende, estamos conforme con la Sentencia hoy emitida, mediante la cual se revoca el dictamen del foro apelativo y se ordena la supresión de la evidencia incautada mediante este registro ilegal.


                                Federico Hernández Denton
                                    Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

Demandante-Recurrido

     v.                       CC-1999-86      Certiorari

José A. Cedeño Laclaustra

Demandado-Peticionario

SENTENCIA

San Juan, Puerto Rico, a 23 de agosto de 2002.

El Ministerio Público presentó acusación contra José A. Cedeño Laclaustra por violación al Art. 401 de la Ley de Sustancias Controladas, Ley Núm. 4 del 23 de junio de 1971, según enmendada, 24 L.P.R.A. sec. 2401 *et seq*. Esto luego de que agentes del Negociado de Rentas Internas del Departamento de Hacienda ocuparan dos (2) paquetes con sustancias controladas que se encontraban en la maleta de éste, la cual había sido examinada por los referidos agentes a través de una maquina de rayos X cuando Cedeño Laclaustra arribó a Puerto Rico en un vuelo procedente de Pennsylvania.

Oportunamente, el acusado interpuso una moción de supresión de evidencia amparada en la Regla 234 de Procedimiento Criminal, 34 L.P.R.A. Ap. II R. 234, en la cual alegó que la sustancia controlada incautada era producto de un registro ilegal, por lo que no debía admitirse en evidencia. Sin embargo, tanto el foro de primera instancia como el tribunal apelativo denegaron la misma.

Cedeño Laclaustra acudió entonces ante nos y reprodujo, esencialmente, sus planteamientos en torno a la ilegalidad del registro realizado.

Luego de examinar las comparecencias de las partes, y estudiar a fondo la controversia planteada, se expide el auto de Certiorari y se dicta Sentencia en la que se revoca el dictamen del foro apelativo y se ordena la supresión de la evidencia incautada mediante un registro ilegal. Se devuelve el caso al Tribunal de Primera Instancia para que continúen los procedimientos conforme lo aquí resuelto.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Hernández Denton emitió Opinión de Conformidad a la que se unen el Juez Presidente señor Andréu García y el Juez Asociado señor Rebollo López.  El Juez Asociado señor Fuster Berlingeri emitió Opinión Disidente.  El Juez Asociado señor Corrada del Río disintió sin opinión escrita.  El Juez Asociado señor Rivera Pérez está inhibido.


Patricia Otón Olivieri
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Demandante-Recurrida

        vs.                     CC-1999-86     CERTIORARI

José A. Cedeño Laclaustra

    Demandado-Peticionario

Opinión Disidente emitida por el Juez Asociado señor FUSTER BERLINGERI

**San Juan, Puerto Rico, a 23 de agosto de 2002.**

En el caso de autos, una escasa mayoría de cuatro (4) miembros del Tribunal decreta que fue ilegal un registro efectuado en el Aeropuerto por un agente de Rentas Internas, quien utilizó como parte de dicho registro una máquina de rayos X que se tiene allí para examinar el equipaje de los pasajeros que llegan a la Isla y así asegurar que nadie introduzca material tributable al país sin pagar los arbitrios correspondientes. La mayoría del Tribunal llega a este resultado mediante una **<u>sentencia</u>** que no sienta precedente, debido a que no existe unanimidad de criterio entre los cuatro Jueces de la mayoría que la emite sobre los fundamentos de su dictamen.

Es mi parecer que el dictamen en cuestión, **que carece de fundamentos mayoritarios**, es erróneo.

No sólo **es contrario a lo resuelto en unas decisiones anteriores por este mismo Tribunal, sino que es contrario también a los principios constitucionales sobre el particular fijados por este Foro y por el propio Tribunal Supremo de Estados Unidos y otros altos foros federales**. Por ello disiento. Veamos.

I

A. <u>Los hechos del caso</u>.

Como bien señala el Procurador General de Puerto Rico en su Informe ante nos, en el caso de autos existen **dos versiones distintas** sobre los hechos acontecidos en el Aeropuerto que dieron lugar al arresto del peticionario por transportar material delictivo. Una versión es la del agente de Rentas Internas que intervino en este caso. La otra es la del peticionario, a quien se le imputa haber violado la Ley de Sustancias Controladas. <u>**No conocemos de modo seguro cuál de esas dos versiones es la veraz. En la etapa procesal en que el caso llega ante nos, no se ha celebrado ningún juicio ni se ha pasado prueba sobre los aspectos principales del caso**</u>. **No se han determinado judicialmente los hechos del caso. No sabemos a ciencia cierta qué ocurrió en el Aeropuerto precisamente. No existe resolución o minuta alguna que contenga determinaciones judiciales sobre el particular.** Si algo podríamos suponer es que la versión del agente fue creída por los foros de instancia, en vista de que uno determinó que existía causa probable para acusar al peticionario y otro denegó la moción de supresión de evidencia del peticionario, decisiones ambas que fueron emitidas luego de que dichos foros celebrasen las vistas correspondientes.

Frente al referido conflicto sobre lo acontecido precisamente en el Aeropuerto, la mayoría del Tribunal **–sin fundamento judicial alguno–** evidentemente acoge la versión del acusado y descarta la del agente de Rentas Internas. **¿Por qué? ¿Cómo se explica este insólito proceder de la mayoría del Tribunal?** ¿Por qué no se acoge la del agente, que aparentemente fue la que los tribunales *a quo* aceptaron como cierta?

Conforme a las alegaciones del agente referido, **no serían ciertas** las siguientes aseveraciones, que se formulan en la opinión de conformidad de tres de los cuatro Jueces de la mayoría, basadas en lo meramente alegado por el peticionario:

(1) Que el peticionario fue **<u>intervenido y detenido</u>** en el Aeropuerto por **uno o más** agentes de Rentas Internas. Más bien, fue una sola persona quien se le acercó al peticionario, se identificó como agente de Rentas Internas, le informó que estaba llevando a cabo una inspección **<u>rutinaria</u>** y le preguntó sobre lo que llevaba en sus maletas.

(2) Que el agente referido **le ordenó** al peticionario que abriera sus maletas y que éste **"acató" la orden**. Más bien, el agente le **solicitó** al peticionario que abriera las maletas, y **éste no presentó objeción a ello.**

La controversia sobre los hechos aludidos es obviamente pertinente a la cuestión sobre la validez jurídica de la acción del agente de Rentas Internas. Lo es porque según la versión de los hechos del peticionario, éste podría aducir que él fue objeto de **un registro penal** y así intentar darle apoyo a la conclusión alegada por éste, y que la mayoría del Tribunal parecer aceptar, de que **<u>toda</u>** la conducta

de los supuestos agentes formó parte de un solo registro subrepticio del peticionario, incluyendo lo relativo al uso de la máquina de rayos X.

La mayoría, pues, convenientemente escoge la versión de los hechos en conflicto **que mejor se ajusta al decreto de invalidez que dicha mayoría se apresura a emitir**, lo cual es claramente contrario a las normas que rigen a un foro apelativo como lo es el nuestro.

B. <u>La cuestión que el peticionario planteó ante nos y ante el Tribunal de Circuito de Apelaciones</u>

Si se examina objetivamente el planteamiento de errores que el peticionario adujo en su recurso ante el Tribunal de Circuito de Apelaciones, se podrá comprobar que el peticionario no cuestionó de modo alguno el uso como tal, por parte del Gobierno, de la máquina de rayos X en el Aeropuerto.[6]

---

[6] PLANTEAMIENTO DE ERRORES (Ante el Tribunal de Circuito de Apelaciones):

1- Incidió el Tribunal de Primera Instancia al determinar que la intervención inicial con el Peticionario fue legal, a pesar de que no se cumplió con el requisito de razonabilidad ("razones para creer") dispuesto por la Sección 6140(a)2 de la Ley Núm. 120 del 31 de octubre de 1994.

2- Incidió el Tribunal de Primera Instancia al determinar que el Acusado consintió al registro de su equipaje renunciando a sus derechos constitucionales.

3- Erró el Tribunal de Primera Instancia al aplicar la Sección 6140 de la Ley 120 del 31 de octubre de 1994 al caso de marras debido a que dicho estatuto violenta de su faz el Debido Proceso de Ley Sustantivo, en específico la Constitución de Puerto Rico en su Artículo II, Sección 10 y la Cuarta Enmienda de la Constitución de Estados Unidos de América en la medida que permite a los Agentes de Rentas Internas del Departamento de Hacienda, realizar registros al equipaje de viajeros inter-estatales sin orden de registro [sic] o y sin el consentimiento de estos.

Lo mismo ocurre con respecto al planteamiento de errores del peticionario en su recurso ante nos.[7]

En ambos recursos, el peticionario en esencia planteó los mismos tres asuntos, a saber: primero, que lo observado por el agente en la máquina de rayos X no fue suficiente para que el agente luego le inquiriese sobre lo que llevaba en las maletas; segundo, que no consintió a que "le abrieran" las maletas, y tercero, que **de su faz** el estatuto que autoriza a los agentes de Rentas Internas a realizar tales **registros físicos** al equipaje de viajeros es inconstitucional porque se trata de registros sin orden judicial.

---

4– Incidió el Tribunal de Primera Instancia al no emitir Resolución escrita a la Solicitud de Supresión de Evidencia presentada por el Acusado en violación al Debido Proceso de Ley ya que con dicha acción coarta el derecho del Acusado a solicitar la revisión de la resolución emitida.

[7] PLANTEAMIENTO DE ERRORES (Ante nos):

1– Incidió el Tribunal de Circuito de Apelaciones al determinar que la intervención inicial con el Peticionario fue legal, a pesar de que no se cumplió con el requisito de razonabilidad ("razones para creer") dispuesto por la Sección 6140(a)2 de la Ley Núm. 120 del 31 de octubre de 1994.

2– Incidió el Tribunal de Circuito de Apelaciones al determinar que el Acusado consintió al registro de su equipaje renunciando "sin coacción" a sus derechos constitucionales.

3– Erró el Tribunal de Circuito de Apelaciones al no pasar juicio sobre la constitucionalidad de la Sección 6140 de la Ley 120 del 31 de octubre de 1994 al caso de marras debido a que dicho estatuto violenta de su faz el debido Proceso de Ley Sustantivo, en específico, la Constitución de Puerto Rico en su artículo II, Sección 10 y la Cuarta Enmienda de la Constitución de Estados Unidos de América, en la medida en que permite a los Agentes de Rentas Internas del Departamento de Hacienda, realizar registros al equipaje de viajeros inter-estatales sin orden de registro y sin el consentimiento de estos.

4– Fue errónea la expresión del Tribunal de Circuito de Apelaciones al señalar que el Peticionario no notificó a las partes el Recurso de Certiorari.

**En ningún lugar el peticionario impugnó en sí el uso de la máquina de rayos X por los agentes de Rentas Internas**. Por ello, el Ministerio Público tampoco tuvo la oportunidad de comparecer judicialmente para sostener a fondo la legalidad de la inspección del equipaje mediante el uso de rayos X. **Más aun, en ninguna ocasión el foro apelativo discutió o siquiera mencionó tal asunto**. Sin embargo, lo del uso de la máquina de rayos X es la médula del análisis que hacen tres de los cuatro Jueces de la mayoría del Tribunal en su dictamen en este caso.

Como se sabe, a este Tribunal le corresponde la función de revisar lo que el foro apelativo resolvió sobre las cuestiones que le planteó el peticionario. Sin embargo, aquí tres de los integrantes de la escasa mayoría del Tribunal se precipitan a resolver una cuestión que el peticionario **no planteó**, y a "revisar" un asunto que nadie ha cuestionado y que el foro apelativo **no dilucidó de modo alguno**. Más aun, la mayoría del Tribunal se aventura a declarar la ilegalidad de una importante acción gubernamental sin haber escuchado lo que el Ministerio Público tuviese que decir sobre el asunto medular del uso de la máquina de rayos X. Por todo ello, el decreto de la mayoría se asemeja mucho a una mera **"opinión consultiva"**, que nos está vedada por la doctrina de la cosa justiciable. E.L.A. v. Aguayo, 80 D.P.R. 552 (1958).

**Cuando menos queda sin explicar por qué la mayoría se aventura a resolver un asunto que no ha sido debidamente planteado ni discutido ante nos, al amparo de unos hechos que no han sido probados**.

Pasemos ahora al examen del aspecto sustantivo del decreto de la mayoría en el caso de autos. Examinemos si se sostiene a la luz de los principios jurídicos pertinentes.

**A.    Normas Relativas al Registro Administrativo**

   **1. El tipo de registro**

Debemos comenzar señalando que el asunto que nos concierne en este caso consiste de un **registro administrativo**. La mayoría del Tribunal no parece tratarlo así porque ello no conviene a su errado decreto jurídico. Pero en términos propios, no cabe duda de que el uso de la máquina de rayos X al que objetan expresamente tres de los cuatro Jueces de la mayoría en el caso de autos constituye precisamente un registro administrativo.

Como se sabe, en nuestro ordenamiento jurídico se reconocen dos tipos distintos de registros gubernamentales. El más tradicional es el registro penal, que llevan a cabo de ordinario los agentes policíacos y cuyo propósito es la detección de actividad criminal. Este tipo de registro conduce al procesamiento penal de los que cometen delitos. El otro tipo, es el registro administrativo. Este lo realiza de ordinario algún funcionario de una agencia u organismo administrativo como parte del esquema regulador de esa entidad. Su propósito es hacer valer la reglamentación que la agencia u organismo administrativo promulgó para regular actividades legítimas de nuestra sociedad. **No tiene nada que ver como tal con la administración de la justicia criminal**. D. Fernández, *Derecho Administrativo*, 2da. Ed., págs. 225-244 (2001); E.L. Chiesa, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Vol. I, pág. 319 (1995). Véase, además, <u>Pueblo</u>

v. Ferreira Morales, res. el 10 de diciembre de 1998, 147 D.P.R. ___ (1998), 98 TSPR 165, 98 JTS 150.

La distinción entre estos dos tipos de registros es jurídicamente muy importante y, claro está, es crucial y determinativa en el caso de autos. Como se explica más adelante, **el registro administrativo que aquí nos concierne puede realizarse corrientemente en casos justificados sin una orden judicial previa, mientras que los registros penales de ordinario son ilícitos si no se realizan en virtud de tal orden judicial**. Como bien señaló el eminente Juez Frankfurter, "searches for evidence of crime (registro penal) present situations demanding the greatest, not the least, restraint upon the Government's intrusion into privacy for ... it was at these searches which the Fourth Amendment was primarily directed." Abel v. U.S., 362 U.S. 217, 237 (1959).

En el caso de autos, el funcionario que intercedió con el peticionario **no era un policía**. Era un agente del Departamento de Hacienda. Su presencia en el Aeropuerto es parte integral de un plan gubernamental para **desalentar la evasión contributiva**. La función del agente en cuestión es parte del esquema administrativo para hacer valer la Ley de Rentas Internas, Ley Núm. 120 del 31 de octubre de 1994, 13 L.P.R.A. sec. 8006 y *et seq*. **Nada tiene que ver como tal con la administración de la justicia criminal de Puerto Rico**. Dicho en términos sencillos, **el agente aludido no estaba en el Aeropuerto para perseguir a traficantes de drogas, sino para viabilizar la recaudación de impuestos**. Su labor administrativa no iba dirigida de ningún modo esencial a descubrir evidencia de actividad criminal sino más bien a evitar la evasión contributiva. Por ello, es evidente que su labor investigativa constituye un registro administrativo y no un registro penal.

Lo anterior se comprueba claramente por el hecho de que en el Aeropuerto también existía al momento de los hechos del caso una división especializada de la Policía de Puerto Rico para combatir el tráfico de drogas, que utiliza para ello perros debidamente adiestrados y otros medios. **Es a esta división de la Policía a quien le compete primordialmente la consecución de objetivos penales**. Es esta división la que tiene la responsabilidad esencial de procurar evidencia de actividad delictiva.

La naturaleza **administrativa** del registro en el Aeropuerto, que aquí nos concierne, ha sido reconocida por voces muy autorizadas. Así pues, el Tribunal de Apelaciones para el Segundo Circuito federal, en una opinión emitida por un eminente juez federal, Henry Friendly, expresamente ha resuelto que los registros en los aeropuertos constituyen **"administrative searches"** similares a los que se conducen en los **"regulated industries"**. U.S. v. Edwards, 498 F2d 496, 498 n.5 (1974).

Así mismo, en el caso principal sobre los registros en los aeropuertos, el Tribunal de Apelaciones para el Noveno Circuito federal resolvió que el hecho de que en estos registros administrativos se descubra material delictivo incidentalmente, no altera su naturaleza administrativa. "Of course, routine airport screening will lead to the discovery of contraband and apprehension of law violators. **This practical consequence does not alter the essentially administrative nature of the screening process, however, or render the searches unconstitutional"**. U.S. v. Davis, 482 F2d 893, 908 (1973). Este medular dictamen aplica a los registros administrativos en los aeropuertos el principio general establecido por el Tribunal Supremo de Estados Unidos de que "items [related to crime]... coming into Government's possession through a lawful

administrative search may be used in a criminal prosecution...". Abel v. U.S., *supra*, pág. 239. Como bien señaló el Juez Frankfurter en dicho caso, no hacer uso en un proceso penal de la evidencia criminal descubierta incidentalmente en el registro administrativo "would be entirely without reason" *Id*. pág. 238.

Finalmente debe señalarse que nosotros mismos hemos resuelto que si, en el curso de un registro administrativo realizado sin orden judicial previa, se descubre prueba utilizable en un proceso penal, ello no cambia la naturaleza del registro administrativo ni le resta validez. Pueblo v. Ferreira, *supra*.


2. **Las normas sobre los registros administrativos**

En virtud de la garantía constitucional en contra de los registros irrazonables dispuesta en el Art. II, Sec. 10 de la Constitución del Estado Libre Asociado de Puerto Rico, hemos resuelto como norma general que de ordinario los registros gubernamentales tienen que estar precedidos por una orden judicial que los autorice. Pueblo v. Miranda Alvarado, 147 D.P.R. 356 (1997); Pueblo v. Narváez Cruz, 121 D.P.R. 429 (1988); Pueblo v. Vázquez Méndez, 117 D.P.R. 170 (1986).

Ahora bien, la garantía constitucional que dispone que no debe realizarse un registro sin orden judicial previa no es absoluta, como no son absolutos ningunos de los derechos fundamentales que garantiza nuestra Constitución. Véase, además, Velásquez Pagán v. A.M.A., 131 D.P.R. 568, 576 (1992); López Vives v. Policía de P.R., 118 D.P.R. 219, 228 (1987); Santiago v. Bobb y el Mundo, 117 D.P.R. 153, 165 (1986), y Pueblo v. Santos Vega, 115 D.P.R. 818, 821 (1984). Soto v. Srio. Justicia, 112 D.P.R. 477, 493 (1982).

En Pueblo v. De Jesús Robles, 92 D.P.R. 345 (1965), establecimos de modo claro la norma general de que un registro sin orden judicial puede ser válido **si dicho registro es razonable**. También hemos establecido cuáles requisitos deben satisfacerse para que un registro sin orden judicial pueda considerarse razonable y, por ende, válido. **La razonabilidad del registro debe evaluarse "a la luz de los hechos y las circunstancias del caso"**. *Id*.

Como se sabe, la garantía constitucional contenida en la Sec. 10 del Art. II de la Constitución de Puerto Rico cubre tanto los registros administrativos como los penales. E.L.A. v. Coca Cola, 115 D.P.R. 197, 207 (1984). La sujeción de los registros administrativos a los requisitos constitucionales referidos no puede obviarse estatutariamente. El Estado no puede autorizar por ley que se realicen registros administrativos que no satisfagan las exigencias constitucionales. E.L.A. v. Coca Cola, *supra*; Camara v. Municipal Court, 387 U.S. 523 (1967); See v. Seattle, 387 U.S. 541 (1967). Sin embargo, ya antes hemos resuelto que **el estándar para determinar la existencia de causa probable en el caso de registros administrativos es más laxo que el que aplica para registros penales**. Hemos resuelto concretamente que existen diferencias importantes entre el registro administrativo y el registro penal.[8] Este último se concibe como algo más ofensivo que una inspección administrativa. "El grado de intromisión con la intimidad y la dignidad del intervenido es generalmente más intenso en los registros penales que en los administrativos. Esta distinción justifica estándares diferentes, **menos rigurosos**,... para establecer causa probable en casos de

---

[8]   También hemos resuelto que mientras más se asemeja el registro administrativo a un registro de índole penal o si el objetivo del registro administrativo es obtener evidencia para un proceso penal,

registros administrativos." E.L.A. v. Coca Cola, *supra*, a las págs. 212-13. (Énfasis suplido).

Más aun, recientemente, en Pueblo v. Ferreira Morales, *supra*, en una opinión emitida por el mismo Juez que emite la opinión de conformidad con el decreto de la mayoría en el caso de autos, este Tribunal no sólo reiteró que la validez de los registros gubernamentales sin orden judicial previa depende de su **razonabilidad** sino que, además, adoptó como norma en Puerto Rico la doctrina federal que establece que **de ordinario no se requiere obtener una orden judicial previa para realizar un registro administrativo cuando se trata de industrias o negocios que estén estrechamente reglamentados**.

En Pueblo v. Ferreira Morales, *supra*, la propia Policía de Puerto Rico había realizado un registro físico sin orden judicial previa en un depósito de chatarra. Resolvimos allí que se trataba de un registro administrativo de dicho lugar, que podía realizarse sin orden judicial previa, aun por policías, porque involucraba un negocio estrechamente regulado y porque el Estado tenía un interés sustancial en la actividad en cuestión. Señalamos que el robo de vehículos de motor constituía "un serio problema social" y que tal robo se facilitaba mediante el desmantelamiento del vehículo que se realiza en los depósitos de chatarra. Indicamos que por ello era necesaria "una fiscalización efectiva de la operación de este tipo de negocio". Señalamos también que en vista de lo anterior, los operadores del negocio referido tenían jurídicamente "una expectativa de intimidad **atenuada** en relación a su operación".

En Pueblo v. Ferreira Morales, *supra*, indicamos concretamente que, en estos casos de actividades comerciales altamente

---

hay que cumplir con las "normas tradicionales exigibles en las causas de naturaleza criminal." E.L.A. v. Coca Cola, *supra*, pág. 213.

reglamentadas, son **válidos** los registros administrativos realizados **sin orden judicial** por funcionarios gubernamentales si se satisfacen los siguientes requisitos:

(1)   debe existir un interés gubernamental sustancial que justifique el esquema regulador bajo el cual el registro en cuestión se realiza;

(2)   la realización de la inspección sin orden debe ser necesaria para adelantar el interés gubernamental, y

(3)   el esquema regulador debe tener suficientes garantías en cuanto a certeza y regularidad como para constituir un sustituto constitucionalmente adecuado a la orden judicial.

**Es menester enfatizar que la normativa que hemos desarrollado en Puerto Rico con respecto a registros administrativos sin previa orden judicial es cónsona con la doctrina federal sobre el particular. Esa doctrina ha sido explicada con meridiana claridad en la fundamental obra de Lafave, *Search an Seizure: A Treatise on the Fourth Amendment* (3rd Ed, West, 1996). Señala Lafave en el acápite 10.6 de dicha obra, "Airport Searches" a la pág. 628 que:**

> **... as noted in <u>United States v. Davis</u>, the 'appropriate standards' for evaluating the new airport search program are to be found in the Supreme Court cases dealing with so-called 'administrative' searches. Because this same conclusion has been reached by other courts, it is appropriate to set out here in some detail the analysis in <u>Davis</u>: 'The essence of these decisions is that searches conducted as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of crime, may be permissible under the Fourth Amendment though not supported by a showing of probable cause directed to a particular place or person to be searched.' (Citas omitidas).**

**En efecto, descansando en la conocida decisión del Tribunal Supremo de Estados Unidos en <u>U.S. v. Biswell</u>, 406 U.S. 311 (1972),**

en U.S. v. Davis, 482 F. 2d 893 (9th Cir. 1973), se aprobó el uso de registros administrativos en un aeropuerto sin previa orden judicial, en vista de que satisfacía los requisitos esenciales para ello, a saber:

> (1) "that the search serves a narrow but compelling administrative objective; and
>
> (2) that the intrusion is as limited as is consistent with satisfaction of the administrative need that justifies it. Davis, *supra*, pág. 910.

Lo esencial, como se ha señalado de modo palmario en U.S. v. $124,570 U.S. Currency, 873 F. 2d 1240 (9th Cir. 1989), es que el registro administrativo sin orden judicial no sea utilizado como un subterfugio con fines penales.

> "To the extent that administrative searches are used for purposes other than those contemplated by the regulatory scheme, they may fall outside the rationale by virtue of which we have approved them. Specifically, in Davis we recognized the danger that 'the screening of passengers . . . will be subverted into a general search for evidence of crime'. Should that danger materialize, . . .we would not hesitate to exclude the evidence so obtained". (citas omitidas.) U.S. v. $124,570 U.S. Currency, *supra*, pág. 1243.

El Juez Friendly, citando al propio Tribunal Supremo de Estados Unidos y a decisiones de numerosos tribunales federales de distintos circuitos, ha resumido la norma aplicable de manera clara y sucinta en U.S. v. Edwards, *supra*:

> Such warrantless administrative searches, conducted pursuant to a general regulatory scheme rather than an investigation to secure evidence of a crime, have regularly been upheld where the statutory procedures have been deemed reasonable.

B.   Aplicación de las normas al caso de autos

1.   Registro administrativo válido

Al aplicar las normas estatales y federales mencionadas antes a la situación de autos, resulta evidente que el uso en el Aeropuerto de la tecnología de rayos X por los agentes de rentas internas satisface todas las exigencias de la normativa referida. Como se ha señalado antes, dicho uso es parte integral de un esquema regulatorio fiscal del Estado que protege un interés público apremiante. Para poder sostener el extenso aparato gubernamental de Puerto Rico y proveerle servicios públicos vitales a toda la comunidad, sobre todo a los miles de personas indigentes que residen en la Isla, el Estado ha establecido un sistema fiscal que descansa en buena medida en los arbitrios que se le imponen abarcadoramente a numerosos artículos de uso y consumo en el país. Contrario a lo que sucede en otras jurisdicciones, en Puerto Rico no se cobran impuestos al momento de la venta de dichos artículos. No existe un "sales tax" generalizado. En su lugar se utiliza el mecanismo del arbitrio sobre las importaciones. Puerto Rico, como una isla de las de más intensa densidad poblacional del mundo, depende vitalmente de la importación de artículos de los mercados de Estados Unidos y del extranjero. La inmensa mayoría de los artículos de primera necesidad, así como los de lujo, que se usan y consumen en la Isla provienen del exterior. Esta realidad ha dado lugar al sistema de arbitrios sobre importaciones que prevalece en el país, como una medida fiscal de carácter esencial. Dicho sistema de arbitrios produce apróximadamente el 30% de las rentas internas del Gobierno de Puerto Rico.[9]

Es menester resaltar que el propio Tribunal Supremo de Estados Unidos ha reconocido la particular amplitud del poder de Puerto Rico para establecer un sistema de arbitrios como el que aquí nos concierne.

---

[9] Véase Documento de Presupuesto de la Oficina de Gerencia y Presupuesto del Gobierno de Puerto Rico, Año Fiscal 1996.

Expresamente ha resuelto que por delegación congresional, Puerto Rico tiene una facultad para imponer arbitrios a artículos que proceden de fuera de la Isla más amplio que la que tienen los estados de la Unión. Puede imponer tales arbitrios tan pronto los artículos en cuestión llegan a la Isla, aunque se encuentren aún en el curso del comercio extranjero o del interestatal; es decir, en su *"original package"*, cosa que le está vedada a los estados de la Unión. West India Oil Co. v. Domenech, 311 U.S. 20 (1940). Esa extraordinaria facultad concedida por ley federal a Puerto Rico desde antes de la creación del Estado Libre Asociado persiste aún en la Ley de Relaciones Federales, 1 L.P.R.A. sec. 3, que además ordena:

> "a los oficiales de aduanas y del servicio postal de Estados Unidos que ayuden a los debidos funcionarios del Gobierno de Puerto Rico en el cobro de estas contribuciones".

La delegación federal apareja un reconocimiento no sólo de la importancia vital del sistema de arbitrios para el gobierno de Puerto Rico, sino además de la necesidad de que hayan medios expeditos para que éste sea efectivo. Así lo reconoció expresamente el Tribunal Supremo de Estados Unidos en West India Oil Co. v. Doménech, *supra*, pág. 28, al resaltar el hecho que el Congreso había ordenado a los agentes federales de aduana y del servicio postal a auxiliar a Puerto Rico en el cobro de los arbitrios referidos. No puede dudarse, pues, que tratamos aquí con un interés apremiante del Estado.

Es precisamente para hacer valer este indispensable esquema regulatorio fiscal que los agentes de rentas internas utilizan las máquinas de rayos x en lugares como el aeropuerto. Se trata de un medio que es evidentemente cónsono con la delegación de poder federal referida antes. Se trata de un medio dirigido a que los millones de

**pasajeros que entran al país anualmente no pretendan violar las leyes fiscales, introduciendo en sus equipajes artículos y materiales por los cuales no se han pagado los arbitrios correspondientes. La importación de artículos de consumo es un evento altamente regulado en Puerto Rico como lo es el Aeropuerto por donde transitan dichos pasajeros y entran al país muchas importaciones. Es la convergencia de esta doblemente intensa regulación pública la que la hace comparable a la de otras industrias o negocios altamente reglamentados.**

Debe reiterarse que este uso de la tecnología de rayos X por los agentes de rentas internas <u>**no existe de modo alguno para poner en vigor las leyes penales**</u> que prohíben el tráfico de narcóticos. <u>**Ese otro esencial objetivo público se atiende en el Aeropuerto mediante un esquema policial distinto y separado**</u>. Como se ha señalado antes, la Policía de Puerto Rico tiene una división especializada destinada al propio aeropuerto, que utiliza perros debidamente adiestrados,[10] y otros medios, para combatir el narcotráfico. Aunque ambos tipos de funcionarios públicos operan en el aeropuerto, los agentes de rentas internas y los policías pertenecen a departamentos gubernamentales diferentes, responden a propósitos distintos y funcionan a base de normas y medios disímiles. Aunque los funcionarios públicos referidos pueden en ocasiones interactuar, como es lícito y necesario que lo hagan, <u>U.S. v. $124,570 U.S. Currency</u>, *supra*, a la pág. 1247, nota al calce 7; <u>U.S. v. Canada</u>, 527 F. 2d 1374 (1975), no tienen encomendados una dualidad de propósitos fiscales y penales. Tales propósitos están esencialmente deslindados y los agentes de rentas

---

[10] Sobre el uso de perros en la lucha contra el narcotráfico en aeropuertos, véase <u>U.S. v. Place</u>, 462 U.S. 696 (1983) y <u>U.S. v. Race</u>, 529 F. 2d 12 (1976).

internas en nada les compete como tal la consecución de objetivos penales.

No puede dudarse que de ordinario lo que acontece en el Aeropuerto tiene **mayor interés público** que lo que sucede en las industrias o negocios que están estrechamente reglamentadas. Por razones obvias, el Aeropuerto es un lugar **más intensamente reglamentado que esas industrias o negocios**. Aun antes del 11 de septiembre de 2001, los aeropuertos son "zonas críticas" en los cuales convergen muchos intereses gubernamentales, como reiteradamente han resuelto los tribunales federales. U.S. v. Herzbrun, 723 F. 2d 773, 775 (1984). Véase también, U.S. v. Doe, 61 F. 3d 107, 110 (1995), y U.S. v. Edwards, *supra*.

Más aun, el interés del Estado en asegurar que no entren al país artículos introducidos ilícitamente es obviamente mayor que el interés del Estado en lograr que en los depósitos de chatarra no existan piezas obtenidas ilegalmente, que fue el contexto en el cual autorizamos los registros administrativos sin orden judicial previa en Pueblo v. Ferreira Morales, *supra*. No debe perderse de vista el hecho fundamental de que el registro administrativo que aquí nos concierne **es parte integral** del sistema contributivo del país, **sin el cual el Estado no puede subsistir**. Hace sólo unos meses atrás, en Burlington Air Express v. Mun. de Carolina, res. el 29 de junio de 2001, 154 D.P.R. ___, 2001 TSPR 98, 2001 JTS 101, reiteramos que la facultad de tributación del Estado Libre Asociado de Puerto Rico es **el más fundamental** de sus poderes públicos y gubernamentales, y que se trata de un poder que es esencial a su subsistencia. Por ello, el uso de las máquinas de rayos X, en una Isla que vive primordialmente de sus importaciones, es un instrumento **esencial** para combatir la evasión contributiva y así hacer efectivo el poder de tributación

referido. No puede haber duda alguna, pues, de que el esquema regulador que aquí nos concierne **está investido de mayor interés público** que el de los depósitos de chatarra, con respecto al cual permitimos el registro administrativo sin orden judicial previa.

Por otro lado, debe considerarse que el uso de los rayos X que aquí nos concierne es **<u>mucho menos intrusivo</u>** que el registro físico que permitimos en el caso del depósito de chatarra. La máquina de rayos X opera fuera de los ojos del público y del de los propios pasajeros. Sólo produce sus efectos con respecto al equipaje. Lo que se observa no tiene ni remotamente la claridad y precisión de una inspección visual. En el caso del registro del depósito de chatarra se realizó abiertamente una inspección física de todo el lugar y se examinaron de modo visual y directo numerosas piezas de vehículos de motor. El registro fue presenciado por los propios dueños y empleados del lugar. Al comparar las dos situaciones, es obvio que el registro físico referido fue mucho más intrusivo que el mero uso de una máquina de rayos X. **<u>Por eso reiteradamente los tribunales federales han destacado el carácter poco intrusivo del uso de los rayos X</u>**. <u>U.S. v. Doe</u>, *supra*,("limited intrusiveness"); <u>U.S. v. 124,570 U.S. Currency</u>, *supra*, ("normally the intrusion is small"); <u>U.S. v. Pulido-Baquerizo</u>, 800 F. 2d 899, 902 (1986) ("slight privacy intrusion"); <u>U.S. v. Wehrli</u>, 637 F. 2d 408, 409 ("negligible social stigma"); <u>U.S. v. Albarado</u>, 495 F. 2d 799 (1974) ("absolutely minimal invasion of privacy").

A la luz de todo lo anterior, parece evidente que si se puede realizar un registro físico de un depósito de chatarra sin orden judicial, mucho más se puede usar una máquina de rayos X en el Aeropuerto sin tal orden. Dicho uso es mucho menos intrusivo que el registro físico referido; el Aeropuerto es un lugar mucho más reglamentado que el depósito de chatarra; y el interés del Estado en

el uso referido de la máquina de rayos X es superior al que tiene en el registro físico del depósito de chatarra.

Al sopesar todo lo anterior, es menester recordar que en última instancia la determinación medular que procede en casos como el de autos es la de **si la intervención estatal en cuestión es razonable**.

**El propio Tribunal Supremo de Estados Unidos se ha expresado en términos claros sobre cuál es la tarea de los tribunales en casos como el de autos. Ha señalado lo siguiente:**

> Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which the search takes place. **The determination of the standard of reasonableness governing any specific class of searches requires "balancing the need to search against the invasion which the search entails**. Camara v. Municipal Court, *supra*.

Utilizando el criterio medular de la "razonabilidad", ¿puede decirse que el referido uso de máquinas de rayos X en el Aeropuerto es irrazonable? ¿Constituye dicho uso uno de los **desmanes gubernamentales** que provocaron el establecimiento de la garantía constitucional invocada aquí por el peticionario?

La respuesta a las interrogantes anteriores es clara. El uso de la tecnología de los rayos X para los fines que ello se hace en el Aeropuerto es **eminentemente razonable**. Su razonabilidad la avala en primer lugar su claro fin público. Como se ha indicado anteriormente, el registro del equipaje de los pasajeros mediante máquinas de rayos X se lleva a cabo para verificar si se está tratando de evadir la responsabilidad de pagar arbitrios conforme a la Ley de Rentas Internas. Se trata, en última instancia, de impedir que se introduzcan subrepticiamente al país artículos sujetos al pago de arbitrios. **Este es un fin apremiante para el Estado**, pues del fiel cumplimiento por parte de los ciudadanos de las obligaciones contributivas depende que el Estado pueda realizar sus ingentes funciones.

Su razonabilidad la avala, además, el hecho de que el referido interés apremiante del Estado se adelanta de la forma más limitada y objetiva posible. El uso de la máquina de rayos X es el método menos intrusivo posible a la intimidad del pasajero. Se trata de una intrusión mínima, que es obviamente menos ofensiva que la alternativa de requerir que se abran las maletas y se examine su contenido, que es la que usa válidamente la Aduana federal con relación al equipaje de pasajeros que llegan al país en vuelos internacionales.[11] No es un registro físico de la persona; no produce la humillación o la indignidad de éste; no se indaga en su vida privada. U.S. v. Albarado, *supra*, pág. 806. Se trata, además, de un método que tiene evidentemente la certeza y regularidad que se requiere constitucionalmente. Mientras más uniforme sea el registro administrativo, menos probabilidades hay de que se cometan injusticias o se discrimine a base de estereotipos. Aquí la inspección por rayos X se le hace a todo el equipaje que llega al país, sin distinción alguna. No puede haber duda alguna sobre la certeza y regularidad del medio en cuestión.

Finalmente, la razonabilidad del uso de la máquina de rayos X la avala el hecho de que si se exigiera la obtención de una orden judicial previa aquí, se derrotaría el esquema jurídico-fiscal en cuestión. Como bien señala el eminente comentarista La Fave, *supra*, pág. 632, citando la opinión del Tribunal Supremo de Estados Unidos en U.S. v. Biswell, 406 U.S. 311 (1972):

---

[11] Aunque Puerto Rico no tiene fronteras aduaneras como es la federal, no puede dudarse que el apremiante interés de Puerto Rico, como isla que depende vitalmente de las importaciones, en verificar que no haya contrabando fiscal es cuando menos tan importante que el que tiene el gobierno federal en su sistema aduanero, que es esencialmente un mecanismo fiscal también.

Por otro lado, debe recordarse el mandato federal mencionado antes a que la aduana federal auxilie al Gobierno de Puerto Rico a cobrar estos arbitrios.

> ... the Supreme Court has held that administrative searches
> may be conducted without a warrant when the practical effect
> of the warrant requirement would be to 'frustrate the
> governmental purpose behind the search'.

Si este medio tan poco intrusivo no estuviese disponible al Estado, no podría verificarse si los pasajeros que llegan a Puerto Rico han cumplido con la obligación de pagar arbitrios. El Estado no tiene otro medio práctico menos intrusivo que el uso de las máquinas de rayos X para el logro del apremiante fin público en cuestión.

En efecto, el uso de la máquina de rayos X en el Aeropuerto cumple perfectamente el criterio de razonabilidad según ha sido definido específicamente por el Tribunal Supremo federal para los registros administrativos. Estos son razonables cuando "... the inspections are neither personal in nature nor aimed at the discovery of evidence of crime". Camara v. Municipal Court, *supra*, pág. 537. El uso de la máquina de rayos X aquí obviamente no es un registro a una persona particular, sino al equipaje de todos los pasajeros, y se hace para desalentar el intento de evadir el pago de arbitrios y no para fines penales. No puede haber dudas de su razonabilidad al amparo precisamente del criterio específico fijado por el Tribunal Supremo de Estados Unidos para ello.

### 2. Ausencia de una expectativa razonable de intimidad

El asunto que aquí nos concierne puede ser examinado también al amparo de otra normativa que es pertinente. Reiteradamente hemos resuelto que para que un registro sin orden judicial sea **ilícito**, la intervención del agente estatal tiene que haber violado la **expectativa razonable de intimidad de la persona afectada**. Pueblo v. Rivera Colón, 128 D.P.R. 672, 684 (1991); Pueblo v. Pérez, 115 D.P.R. 827, 830 (1984); E.L.A. v. P.R. Tel. Co., 114 D.P.R. 394, 402 (1983); Pueblo v. Luzón, 113 D.P.R. 315, 326 (1982); Pueblo v. Lebrón, 108 D.P.R.

324, 332 (1979). Esa expectativa de intimidad tiene dos componentes: el primero es la expectativa <u>subjetiva</u> que tiene la persona afectada; el segundo es que la sociedad como tal esté dispuesta a reconocer que la expectativa subjetiva referida es razonable. <u>California v. Greenwood</u>, 486 U.S. 35 (1988); <u>Oliver v. U.S.</u>, 466 U.S. 170, 177 (1984).

En el caso de autos, aun antes del 11 de septiembre de 2001, las circunstancias del Aeropuerto y los numerosos registros de equipaje que allí se realizaban hacen insostenible suponer que el peticionario tenía una expectativa **razonable** de intimidad con respecto a la inspección por rayos X del bulto en que portaba material delictivo. En la actualidad, debido a las muchas nuevas y rígidas medidas de inspección y vigilancia que se han establecido en el Aeropuerto como resultado de la horrenda catástrofe del 11 de septiembre de 2001, sería absurdo suponer que nadie que viaje a través del aeropuerto pueda tener una expectativa razonable de intimidad con respecto a su equipaje. Pero aun antes de esa fecha tampoco era razonable sostener tal expectativa. Al momento de los hechos de este caso, en el Aeropuerto referido todos los pasajeros que abordaban un avión, y el equipaje de mano que cargaban, eran sometidos a un registro electrónico por agentes de seguridad. Su otro equipaje, que depositaban en el avión y que no llevaban a la mano, también era sometido a un registro electrónico por agentes del Departamento de Agricultura federal, si el vuelo era hacia los Estados Unidos, y por agentes de seguridad si el vuelo era al extranjero.

Por otro lado, los pasajeros que llegaban a Puerto Rico, como el peticionario, eran sometidos a un registro electrónico—tanto la persona como el equipaje de mano--al abordar el avión que los trajo al país. Si el vuelo procedía del extranjero, también estaban sujetos

a un registro físico por los agentes de aduana al llegar a Puerto Rico. Así mismo, éstos y los que llegaban de Estados Unidos podían estar sometidos a un registro olfativo por los canes de los agentes policíacos encargados de impedir el narcotráfico.

El Aeropuerto, pues, aun entonces era un lugar en el cual numerosos y diversos agentes del orden público —estatales, federales y privados— mantenían una estrecha vigilancia sobre los pasajeros y sus equipajes, para fines distintos: de seguridad, penales, fiscales, de salubridad y otros. Cotidianamente se llevaban a cabo diferentes tipos de registros, y el equipaje de un pasajero podía estar regularmente sometido a más de uno de esos registros. **¡Aun entonces se trataba de una plaza de múltiples inspecciones!** En tales circunstancias, ¿es razonable suponer que un pasajero, que ya había sido registrado al abordar el avión, quizás en más de una ocasión, continuaba teniendo una expectativa de intimidad sobre la inspección por rayos X del bulto en el que traía material delictivo, en un local tan público y vigilado como era el Aeropuerto? Y lo que es más importante aún, **¿puede suponerse que la sociedad estima que tal expectativa es razonable?** ¿Puede suponerse que en las circunstancias del Aeropuerto, el bulto con el material delictivo constituye para la sociedad uno de esos objetos personales que merecen la más escrupulosa protección constitucional contra la invasión gubernamental? Oliver v. U.S., *supra*, pág. 178.

La respuesta a estas interrogantes nos parece evidente. Como bien señaló el Tribunal de Circuito de Apelaciones federal para el noveno circuito en U.S. v. Pulido-Barquerizo, *supra*, en relación al uso de las máquinas de rayos X para fines de seguridad, "It is a privacy intrusion we believe free society is willing to tolerate". Así mismo, como también señaló el Juez Friendly sobre el mismo asunto hablando

por el tribunal en U.S. v. Edwards, *supra*, pág. 498, "nothing in the history of the Fourth Amendment remotely suggests that the Framers would have wished to prohibit reasonable measures to prevent the boarding of vessels by passengers intent on piracy". O, como se señaló en U.S. v. $124,570 U.S. Currency, *supra*, "Americans submit to metal detectors and X rays devices without a second thought". No vemos por qué la muy favorable actitud pública con respecto al uso de la máquina de rayos X sea distinta sólo porque ésta se destine a evitar la evasión contributiva. Dicha evasión constituye un mal social que es altamente reprochable, repudiado sobre todo por los que cumplen fielmente con sus propias cargas contributivas. El juicio comunitario de personas razonables que no juzgan a base de rebuscamientos legalistas sino por sentido común, es indudablemente que, en casos como el de autos, no es legítima la referida expectativa subjetiva de intimidad del evasor contrabandista, si alguna éste realmente tenía. La sociedad ciertamente "está dispuesta a tolerar un tipo de intrusión menor, socialmente deseable para el bienestar general en términos de un pensamiento utilitario". E.L. Chiesa, *supra*, pág. 229.

Nótese, además, que la situación del caso de autos no es esencialmente distinta a la de otras situaciones en las que hemos resuelto que la expectativa de intimidad que un individuo pueda tener en circunstancias relacionadas directamente con la comisión de un acto criminal es **limitada**. Pueblo v. Santiago, 139 D.P.R. 360, 390-91 (1995); P.R. Tel Co. v. Martínez, 114 D.P.R. 328, 345 (1983). Véase, además, Pueblo v. Colón Rafucci, 139 D.P.R. 959, 966-67 (1996). No debemos olvidar el juicio sobre el particular de los que redactaron nuestra Constitución de que "*las garantías personales frente al arresto, el registro, la incautación y el allanamiento tienen su*

*límite en la conducta criminal.*" *Diario de Sesiones de la Asamblea Constituyente*, pág. 2568.

Por todo lo anterior, parece evidente que no existía en este caso una expectativa razonable de intimidad.

\* \* \* \*

En resumen, pues, a la luz del balance de intereses que debe hacerse en estos casos para determinar si el registro fue razonable, <u>Pueblo v. Dolce</u>, 105 D.P.R. 422, 434-35 (1976), aquí tenemos un interés del Estado vital y apremiante que debe sopesarse frente a una intrusión menor y rutinaria con el equipaje de un pasajero que no puede tener una expectativa razonable de intimidad. La balanza se inclina inexorablemente a favor del registro administrativo en cuestión. Lo único irrazonable aquí es la peregrina suposición de unos pocos miembros Tribunal de que en el caso de autos el Estado ha incurrido en un desmán de tal gravedad que amerita invalidar un medio útil y valioso de promover su supervivencia. Suponer que se pueda privar al Estado de esta herramienta moderna, poco intrusiva, **que a nadie incomoda** excepto a los que procuran evadir las responsabilidades fiscales que la inmensa mayoría de las personas cumplen, choca estrepitosamente contra el sentido común y contra el sentido jurídico auténtico.

3. <u>**Distinción del caso de Torres v. Puerto Rico**</u>

**Para concluir debe señalarse que el insólito decreto de la escasa mayoría de nuestro Foro en el caso de autos parece estar propiciado por el temor de que el Tribunal Supremo federal pueda revocar una decisión nuestra que favoreciese el uso referido de las máquinas de rayos X. Ese temor surge por razón de lo dispuesto en <u>Torres v. Puerto Rico</u>, 442 U.S. 465 (1979). En ese caso, un <u>policía</u> de la División de**

Investigaciones Criminales de Puerto Rico había detenido a un pasajero en el Aeropuerto porque supuestamente parecía nervioso, y lo había llevado a un cuarto aparte donde fue obligado a abrir su equipaje, luego que se le negara la oportunidad de llamar por teléfono a un abogado que era pariente suyo. El Tribunal Supremo federal resolvió que tal registro era ilegal, e invalidó una disposición de una ley nuestra que autorizaba a la Policía a registrar el equipaje de cualquier persona que llegara a Puerto Rico. La ley aludida, según interpretada por el Tribunal Supremo americano, no requería motivos fundados ni orden judicial para hacer registros físicos del equipaje de los pasajeros, aunque sí requería motivos fundados para registrar a las personas.[12] Es decir, la ley referida autorizaba a la Policía de Puerto Rico a realizar un registro físico de índole penal a cualquier equipaje que la Policía quisiera. El Tribunal Supremo federal determinó que los requisitos de la Cuarta Enmienda de la Constitución federal aplicaban a los aeropuertos del Estado Libre Asociado y rehusó expresamente exceptuar del requisito de causa probable a tales registros de equipaje en aeropuertos. "The government interests to be served in the detection or prevention of crime are subject to traditional standards of probable cause to believe that incriminating evidence will be found." Torres v. Puerto Rico, *Id.*, pág. 471. Resulta claro, pues, que bajo la normativa constitucional federal relativa al registro físico para fines penales de equipajes

---

[12] La Ley 22 del 6 de agosto de 1975, 25 L.P.R.A. sec. 1051, disponía en su sección 1 lo siguiente: "Se faculta y autoriza a la Policía de Puerto Rico, a inspeccionar el equipaje, paquetes, bultos y carteras de pasajeros y de la tripulación que desembarquen en los aeropuertos y muelles de Puerto Rico provenientes de los Estados Unidos, examinar carga que sea traída al país y llevar a cabo la detención, interrogación y registro de aquellas personas sobre las cuales tuvieren motivos fundados para creer que portan ilegalmente sobre su persona armas de fuego, explosivos, sustancias narcóticas, deprimentes o estimulantes o sustancias similares."

particulares en aeropuertos, un agente del orden público no puede realizar tal registro sin orden judicial a menos que tenga motivos fundados para creer que se transporta material ilícito en el equipaje. Pero nótese que los hechos y el ámbito de la decisión referida son muy distintos a los del caso de autos. Lo que dicha decisión prohíbe es que se realice un registro penal físico del equipaje de personas particulares, en circunstancias ominosas, sin haber motivos fundados para ello, que era lo que se pretendía con la ley en cuestión. La situación del caso de autos es muy distinta a la de Torres v. Puerto Rico, *supra*. Varias circunstancias esenciales distinguen a un caso del otro. En primer lugar, en el caso de autos no hay un registro penal, sino uno administrativo; en segundo lugar, en el caso de autos no se trata de un registro físico ominoso del equipaje, sino un registro rutinario realizado mediante el medio poco intrusivo de los rayos X; en tercer lugar, no se registra equipaje de alguna persona en particular que había sido detenida antes del registro y ordenada a abrir su maleta, sino el registro genérico del equipaje de todas las personas, sin distinción, que no han sido detenidas para nada antes. El uso rutinario y poco intrusivo de la máquina de rayos X, para fines fiscales, con respecto a todo equipaje que llega al aeropuerto, pues, es claramente distinguible del muy intrusivo registro físico de alguna persona en particular, con fines penales, que se invalidó en Torres v. Puerto Rico, *supra*. No debe este Tribunal apresurarse a invalidar un apremiante esquema regulador nuestro, a base de especulaciones cuestionables sobre lo que decidiría el Tribunal Supremo federal con respecto a una situación tan distinguible de la de Torres v. Puerto Rico, *supra*, como es la que aquí nos concierne. No es ello función nuestra, ni la Constitución federal exige que seamos "más papistas que el papa". Nuestra adhesión a los principios fundamentales de la

Constitución de Estados Unidos, según interpretados por el Tribunal Supremo norteamericano, no requiere que en un caso claramente novel como es el de autos, se asuma una postura que va mucho más allá de lo que ese Foro ha resuelto concretamente en situaciones que presentan cuestiones remotamente análogas, sobre todo cuando tal postura resulta en la invalidación de una importante política estatal. Véase, Oregon v. Hass, 420 U.S. 714, 719 (1974).

Debe enfatizarse que las circunstancias del caso de autos y las de Torres v. Puerto Rico, *supra*, son fundamentalmente distintas y distinguibles, no sólo por las tres razones identificadas antes, sino por otra más también que debe singularizarse. La situación de hechos en Torres v. Puerto Rico, *supra*, es la instancia típica para la cual existe la protección de la Cuarta Enmienda de la Constitución federal: se había detenido a una persona particular arbitrariamente, y sin motivos fundados se le había llevado a un cuarto aparte donde se le obligó a abrir su maleta. Todo esto realizado sin orden judicial previa. Este proceder es obviamente de naturaleza gravemente denigrante y ofensiva y constituye clásicamente el tipo de proceder policíaco que se quiere evitar con la garantía constitucional de la orden judicial previa. En el caso de autos, el uso de la máquina de rayos X no involucra policías, no va dirigido a nadie en particular, no conlleva la detención previa de persona alguna, no se obliga a nadie a abrir su maleta ni se procura evidencia para una convicción penal. El uso rutinario, impersonal y genérico de la máquina de rayos X no presenta la cuestión legal que estaba presente en Torres v. Puerto Rico, *supra*, sino otra esencialmente distinta de si el uso de la máquina referida es razonable. Porque uno y otro caso tratan en lo primordial con asuntos y situaciones legales radicalmente distintos es la razón evidente por la cual en Torres v. Puerto Rico, *supra*, ni

siquiera se cita la decisión de <u>West India Oil Co. v. Doménech</u>, aunque ésta y la de <u>Torres v. Puerto Rico</u>, *supra*, ambas aludían colateralmente a la cuestión de si Puerto Rico tiene poderes aduaneros. Pretender que el caso de autos se rige por <u>Torres v. Puerto Rico</u>, *supra*, es, pues, igual a comparar "chinas con botellas". Más bien, el asunto del caso de autos es uno novel en nuestro foro judicial, aunque ha surgido ya con mucha frecuencia en la jurisdicción federal. Conviene revisar lo que ha sucedido en ésta. Veamos.

En la esfera federal, el asunto de los registros en los aeropuertos se convirtió en una cuestión importante inicialmente en la década de los setenta a raíz del surgimiento de la creciente práctica de piratería de aviones ("hijacking"). Como medidas de seguridad, las autoridades correspondientes reaccionaron implantando los <u>registros electrónicos</u> de pasajeros y equipaje al abordar los aviones, y ello dio lugar a que aparecieran problemas judiciales con respecto al alcance de los registros en los aeropuertos. <u>Debe quedar claro que los problemas referidos no eran con el uso de la tecnología electrónica en tales registros</u>. <u>No fueron las máquinas de rayos X ni los magnetómetros los que provocaron los principales cuestionamientos jurídicos en los tribunales norteamericanos</u>. Por el contrario, el uso de estos aparatos para inspeccionar a los pasajeros y sus equipajes se consideró de inmediato y continuamente <u>como una medida válida</u> para proteger el alto interés público que existía en la seguridad de las personas que viajaban por avión. 4 La Fave, *Search and Seizure, A Treatise on the Fourth Amendment* (West 1996), págs. 638-39. Véase, además, Chiesa, *supra*, pág. 323, y <u>U.S. v. Albarado</u>, 495 F. 2d 799 (1974).

El asunto que provocó los muchos pleitos federales que surgieron fue lo que ocurría <u>después</u> que el pasajero o su equipaje eran

inspeccionados mediante los aparatos electrónicos. Así pues, con frecuencia, en la máquina de rayos X sólo aparecía algún objeto oscuro no identificable, lo que provocaba la sospecha de los guardias de seguridad de que podía tratarse de algún camuflaje para ocultar armas o explosivos. La cuestión neurálgica que surgía entonces era si procedía que los funcionarios del aeropuerto llevasen a cabo en ese momento un registro <u>físico</u> del equipaje o del pasajero, sin tener una orden judicial para ello.

Esta, y no el uso en sí del aparato electrónico, fue la controversia medular en numerosos casos que llegaron a los tribunales de circuitos federales, tales como <u>U.S. v. Doe</u>, *supra*; <u>U.S. v. Pulido Barquerizo</u>, *supra*; <u>U.S. v. $124,570 U.S. Currency</u>, *supra*; <u>U.S. v. Herzbrum</u>, *supra*; <u>U.S. v. Clay</u>, 638 F. 2d 889; <u>U.S. v. Wehrli</u>, *supra*; <u>U.S. v. De Angelo</u>, 584 F. 2d 46 (1978); <u>U.S. v. Albarado</u>, *supra*; <u>U.S. v. Cyzewski</u>, 484 F. 2d 509 (1973); <u>U.S. v. Edwards</u>, *supra*; y <u>U.S. v. Bell</u>, 464 F. 2d 667 (1972). En todos estos casos, el problema medular lo presentaba la necesidad de armonizar el necesario registro <u>físico</u> <u>de algún equipaje particular</u>, realizado sin orden judicial después del registro electrónico genérico y rutinario, con las exigencias de la Cuarta Enmienda de la Constitución de Estados Unidos. En <u>U.S. v. Albarado</u>, *supra*, pág. 804, se formuló el problema en los siguientes términos:

> [Such searches do not seem] to fit readily within any of the traditional exceptions to the warrant requirement and yet each seems reasonable in the light of the overwhelming public acceptance of the search and the necessity for it ...

> ... An airport search as a practical matter cannot be subjected to the warrant procedure. The ultimate standard... is one of reasonableness".

El eminente Juez Friendly formuló el problema referido de manera profunda y elocuente en U.S. v. Edwards, *supra*, págs. 498-99:

> Although no one could reconcile all the views expressed in the opinions of the various circuits or, indeed, of this circuit alone, a consensus does seem to be emerging that an airport search is not to be condemned as violating the Fourth Amendment simply because it does not precisely fit into one of the previously recognized categories for dispensing with a search warrant, but only if the search is "unreasonable" on the facts. This is altogether in line with the command of the first clause of the Amendment, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated..." Surprise has been expressed that "the Amendment nowhere connects the two clauses; it nowhere says in terms that one might expect it to say: that all searches without a warrant issued in compliance with the condition specified in the second clause are *eo ipso* unreasonable under the first." *Trial Manual for the Defense of Criminal Cases* (Preliminary Draft No. 1, Sept. 29, 1966), Joint Committee on Legal Education of the A.L.I. and A.B.A., 28. But, as Professor Telford Taylor demonstrated in a brilliant lecture, *Search, Seizure and Surveillance*, this was not a lapse by the draftsmen. Rather "our constitutional fathers were not concerned about warrantless searches, but about overreaching warrants." While the heavy judicial gloss that a warrantless search is invalid unless within an appropriate "exception" is surely here to stay, recognition of the historical background of the Amendment, with its stress on the seizure of books and papers on political affairs and the search of homes for illegally imported goods, helps to determine when an exception is justified. Nothing in the history of the Amendment remotely suggests that the framers would have wished to prohibit reasonable measures to prevent the boarding of vessels by passengers intent on piracy.

En resumen, pues, en ninguna de las numerosas decisiones de los tribunales de apelación de los circuitos federales se ha determinado que el uso de una máquina de rayos X para un registro administrativo sea inconstitucional. Más aun, en la generalidad de estos casos, el propio Tribunal Supremo federal ha denegado la solicitud de *certiorari* que los afectados presentaron ante ese Foro, intimando así que la doctrina jurisprudencial desarrollada por los tribunales de circuito es la correcta. En efecto, recientemente dicho Tribunal Supremo resolvió expresamente que la expectativa de intimidad de los pasajeros

de avión con respecto a su equipaje es <u>menor</u> que la que existe de ordinario. Véase, <u>Florida v. J.L.</u>, 68 Law Week 4236 (2000).

Más aun, en muchas de las decisiones federales referidas no sólo se ha dado por sentado que el uso de la máquina de rayos X en los registros en aeropuertos es válido sino que, además, se han aprobado incluso los registros <u>físicos</u> de los propios pasajeros o de su equipaje referidos antes. Se ha hecho hincapié en que el uso del medio electrónico es una intrusión mínima mientras que el registro físico es una intrusión grave ("gross invasion of one's privacy, <u>U.S. v. Albarado</u>, *supra*, pág. 807); <u>pero aun así se ha convalidado inclusive el registro físico, por considerarse razonable</u>. Siguiendo la metodología tradicional en este campo del derecho constitucional, se ha balanceado el derecho a la intimidad de los pasajeros con el alto interés público en la seguridad en el aeropuerto, conscientes los jueces federales de que en estos tipos de registros no están presentes los <u>desmanes gubernamentales</u> que se quieren proscribir mediante la aplicación de la Cuarta Enmienda.

El caso de autos, según se ha señalado antes, es un <u>caso novel</u>. No se ha ni siquiera planteado en la esfera federal una impugnación del uso de la máquina de rayos X en un aeropuerto en el contexto del interés de una jurisdicción estatal de proteger su propia supervivencia evitando la evasión contributiva, ni es probable que se plantee, a no ser en un caso de Puerto Rico.[13] Si la situación de la piratería aérea referida antes se consideró *sui generis* por los tribunales federales, <u>U.S. v. Herzburn</u>, *supra*, pág. 775, y por lo tanto

---

[13] En toda probabilidad no ha surgido el asunto porque los estados de la Unión, de haber alguno que tenga un sistema de arbitrios como el de Puerto Rico, no tienen autoridad para hacer valer el arbitrio mientras los artículos sobre los cuales recae son importaciones que están aún en su "*original package*". Según se explicó antes, se trata de una autoridad especial que Puerto Rico tiene.

justificativa de consideraciones especiales bajo la Cuarta Enmienda ("special Fourth Amendment considerations apply" Id.), igualmente ha de considerarse así la del caso de autos, que también es *sui géneris*, sin posible paralelo en la generalidad de los estados de la Unión. Involucra una Isla con enormes problemas económicos, que vive de las importaciones, y a la cual el Congreso de Estados Unidos, desde hace más de un siglo ya, le concedió un amplísimo poder de imponer arbitrios sobre los artículos que se introducen al país, más amplio que el que tienen los estados de la Unión, y que incluso incluye un mandato a la Aduana federal y al Correo de ayudar a hacer efectivo ese poder. 31 Stat. 77. El historial relatado antes, sobre el acomodo que los tribunales federales le han extendido a las necesidades de seguridad o de salubridad (U.S. v. Schafter, 461 F. 2d 856 (1972)), al permitir los registros físicos en los aeropuertos, sugiere claramente que el uso tan poco intrusivo de la máquina de rayos X en nuestro Aeropuerto para proteger un fin estatal apremiante sería considerado como legítimo por el más alto foro federal, por su eminente razonabilidad y por ser una situación muy particular nuestra, que se ampara en una necesidad de Puerto Rico que ha sido refrendada por el Congreso de Estados Unidos. No tiene sentido jurídico alguno, pues, que a base de temores infundados y de una aplicación deficiente de los principios jurídicos pertinentes, unos pocos miembros de este Tribunal estén dispuestos a aherrojar al Estado en cuanto a un asunto tan vital a su supervivencia, que no representa desmán de clase alguna y que el público claramente acepta.

4. Otros usos de medios electrónicos de inspección

Para concluir, debe hacerse una breve mención de una instancia previa en la que este Tribunal ha permitido el uso de un mecanismo

electrónico para un tipo de inspección de las personas y de sus bultos. Se trata específicamente del registro por medios electrónicos de la mercancía obtenida en una empresa comercial, que el consumidor lleva consigo en su persona o en alguna cartera, bolsa o bulto. En Soc. Gananciales v. G. Padín Co. Inc., 117 D.P.R. 94, 107 (1986), establecimos como norma general que en aras de proteger su derecho de propiedad, los establecimientos comerciales podían utilizar el sistema electrónico de registro conocido como *sensormatic* "o cualquiera otro similar" con el fin de evitar el hurto de la mercancía que se vende en dichos establecimientos, sin ninguna orden judicial previa.

Es de conocimiento general que alguno de los medios aludidos son esencialmente similares a los magnetómetros, y realizan un registro electrónico de la persona cuando ésta pasa por un arco electrónico ubicado a la salida de la tienda. El medio referido emite una alarma si la mercancía que la persona lleva consigo no ha sido desactivada.

A la luz de lo anterior cabe preguntarse por qué al menos tres de los cuatro Jueces de la escasa mayoría de este Tribunal pretende aquí negarle al Estado el uso de un medio de registro electrónico para viabilizar un fin público legítimo y apremiante, cuando ya se le ha permitido usarlo a las empresas comerciales para que éstas se protejan en contra del hurto de su propiedad. ¿Es que el interés referido de las empresas comerciales es superior al interés del Estado en evitar la evasión contributiva? ¿Por qué puede la empresa comercial socorrerse mediante el uso de tecnología moderna poco invasiva del derecho a la intimidad pero el Estado NO, cuando ese derecho a la intimidad protege a las personas de intrusiones realizadas tanto por el Estado como por entidades privadas, según hemos resuelto reiteradamente? ¿No debe este Tribunal ser consistente en sus

pronunciamientos y decretos normativos? ¿O es que no estamos obligados a proteger los intereses apremiantes del Estado con el mismo celo que protegemos los intereses de propiedad de las empresas privadas?

Parece evidente que, por la misma lógica de razonabilidad que usamos para aprobar el uso de los registros electrónicos en los establecimientos comerciales, estamos compelidos a aprobar el uso de la máquina de rayos X en el Aeropuerto. Resolver de otro modo sólo refleja nuestra grave inconsistencia normativa o quizás una animosidad frente a legítimos intereses del Estado que no es parte de la función judicial.

## III

Pasemos ahora al análisis de los otros aspectos del registro en este caso. "Si el registro es razonable o no, dependerá de los hechos y circunstancias especiales de cada caso, 'la atmósfera total'. Pueblo v. De Jesús Robles, 92 D.P.R. 345 (1965)." Pueblo v. Acevedo Escobar, 112 D.P.R. 770, 776 (1982).

En el caso de autos, el agente de Rentas Internas inspeccionó el equipaje del acusado, al igual que todo otro equipaje del vuelo, mediante la máquina de rayos X, en virtud de la Ley de Rentas Internas referida. Dicho agente, que tenía adiestramiento y experiencia en la labor de detectar material tributable escondido, observó en la pantalla de la máquina de rayos X que el equipaje del acusado incluía un bulto oscuro que parecía ser material tributable. En vista de ello, y en virtud de la autoridad que le proveía la Ley referida, el agente procedió **a preguntarle al acusado** sobre qué llevaba en sus maletas. **Esta segunda fase de la intervención del agente de Rentas Internas fue evidentemente válida también**. El peticionario no estaba bajo custodia ni fue objeto de un interrogatorio. No estaban presentes las

circunstancias requeridas para que se activasen las llamadas protecciones y advertencias de *Miranda*. E. Chiesa, *supra*, págs. 44-53. Se trataba de una mera interpelación, que el agente venía obligado a hacer para cumplir con su deber. Ya antes hemos resuelto que los agentes del orden público tienen la obligación de investigar la posible actividad delictiva. Pueblo v. Ortiz Martínez, 116 D.P.R. 139, 144 (1985). En el ejercicio razonable de esa obligación, pueden hacer preguntas pertinentes a su investigación a personas que se encuentran en circunstancias sospechosas. Pueblo v. Ruiz Bosch, 127 D.P.R. 762, 771 (1991). El agente, pues, actuó legítimamente al inquirir sobre el contenido de las maletas del acusado.

Cabe señalar que la situación del caso de autos es esencialmente similar a la que tuvo ante sí el Tribunal Supremo de Estados Unidos en Florida v. Rodríguez, 469 U.S. 1 (1984). Allí unos agentes del orden público se acercaron a un pasajero en un aeropuerto, luego de observar cierta conducta sospechosa de parte de éste. Los agentes pararon al pasajero y le hicieron algunas preguntas. El más alto foro judicial federal determinó que la intervención referida de los agentes con el pasajero era válida. Indicó que una detención temporera en un aeropuerto, como la de dicho caso, era permisible debido al gran interés público que existe en la prevención de transacciones ilegales relacionadas al narcotráfico. En particular, el Tribunal Supremo federal resolvió que:

> "the initial contact between the officers and respondent, where they simply asked if he would step aside and talk with them, was clearly the sort of consensual encounter that implicates no Fourth Amendment interest." Id, a la pág. 171.

Más recientemente, el 17 de junio de 2002, el Tribunal Supremo de Estados Unidos reiteró y abundó sobre este asunto. Se trataba de

un caso en el cual tres policías estatales llevaron a cabo una inspección de rutina de un autobús. Abordaron el vehículo sin siquiera tener sospechas sobre alguno de los pasajeros, y comenzaron a interrogar a varios de ellos, sin antes advertirles que no estaban obligados a responder. Uno de los policías, que carecían de una orden judicial previa, le preguntó a uno de los pasajeros si podía inspeccionar su equipaje. El pasajero no objetó y el policía procedió a realizar la inspección referida, pero no encontró material delictivo en el equipaje. Entonces el policía le preguntó al pasajero que si podía inspeccionar su propia persona. El pasajero no objetó. El policía procedió con el registro personal y encontró que el pasajero en cuestión tenía bolsas de cocaína adheridas a sus piernas. El policía procedió a arrestar al pasajero.

En este contexto, el más alto foro federal americano validó la acción de los policías antes relatada y resolvió que los policías podían interrogar los pasajeros al azar y solicitarles su permiso para registrar sus personas y equipajes, aun sin haberles advertido antes que no estaban obligados a cooperar. U.S. v. Drayton, 2002 Law Week 4552. Resolvió así mismo que si la conducta de la policía no era coercitiva o intimidante, el registro referido sin orden judicial previa era válido por haber sido consentido. Id.

En U.S. v. Drayton, *supra*, hubo tres jueces disidentes. Estos protestaron que los otros seis jueces del foro, quienes apoyaron la opinión del Tribunal, hubiesen extendido aquí a un autobús el tipo de conducta policial referida, **que antes sólo se había permitido en los aeropuertos**, 2002 Law Week 4556. Todos los miembros del Tribunal, pues, reiteraron así el amplio alcance de los registros policíacos que pueden realizarse en los aeropuertos sin orden judicial previa, debido a las circunstancias especiales de éstos.

En el caso de autos, el pasajero no sólo contestó la pregunta del agente de Rentas Internas, sino que incluso admitió que tenía marihuana en las maletas. **Hizo voluntariamente una admisión de conducta delictiva**. El agente entonces le pidió al pasajero que abriese las maletas en cuestión, lo que éste hizo sin objeción o reparo alguno. Se ha planteado ante nos que se realizó así un registro inválido porque el agente no tenía una orden judicial para abrir las maletas del acusado.

**Como se sabe, al interpretar el concepto de "razonabilidad", hemos reconocido excepciones concretas al principio de invalidez de los registros realizados sin orden judicial previa. Una de ellas es cuando la persona con autoridad respecto a la cosa a ser registrada consiente voluntariamente a que se realice el registro. Pueblo v. Santiago Alicea, 138 D.P.R. 230 (1995); Pueblo v. Narváez Cruz, 121 D.P.R. 429, 436 (1988). Si el titular del derecho lo renuncia, el registro sin orden resulta válido. Tal renuncia puede ser** implícita **(tácita). Pueblo en interés del menor N.O.R., 136 D.P.R. 949 (1994); Schekloth v. Bustamante, 412 U.S. 218, 234 (1973). "Una forma en que se entiende prestado el consentimiento implícito es aquella donde una persona obedece sin protestar el pedido de un funcionario; la persona no accede expresamente [a lo pedido] pero su acto, en unión al examen de la totalidad de las circunstancias, demuestra su intención de consentir al registro". Pueblo en interés del menor N.O.R.,** *supra*, **a la pág. 965.**

**La norma que permite el registro sin orden judicial cuando existe consentimiento tácito o implícito la anunciamos por primera vez en Pueblo v. Acevedo Escobar, 112 D.P.R. 770 (1982). En ese caso, unos agentes del orden público detuvieron un vehículo de motor con la intención de solicitarle al conductor las licencias de conducir y del**

**vehículo. Uno de los agentes le solicitó, además, que** <u>abriera el baúl del vehículo</u>**. El conductor accedió, y se encontró dentro de éste un bulto cerrado del cual salía olor a marihuana. Se procedió a** <u>abrir el bulto</u>**, encontrándose la droga allí. Resolvimos entonces que el baúl había sido abierto válidamente, por consentimiento del conductor. Resolvimos, igualmente, que el bulto también había sido abierto válidamente, por encontrarse la evidencia a plena vista (olfato).**

Como puede observarse, en Pueblo v. Acevedo Escobar, *supra*, realmente reconocimos **dos excepciones** a la norma constitucional que requiere una orden judicial previa para el registro: la excepción del registro consentido tácitamente, y la excepción del registro cuando la evidencia está a plena vista. Ya antes, en Pueblo v. Dolce, 105 D.P.R. 422 (1976), habíamos resuelto que es válido un registro sin orden judicial cuando el agente del orden público encara un acto ilegal a plena vista. Señalamos allí que si el agente que realiza el registro tenía derecho a estar en el lugar donde se descubre la prueba y éste la descubre directamente antes del registro, entonces el registro en cuestión puede realizarse válidamente sin orden judicial y ello no viola los derechos del acusado bajo las disposiciones de la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico. *Id.*, págs. 435-36.

En el caso de autos, a la luz de la normativa referida en los tres párrafos anteriores, es evidente que el planteamiento del peticionario sobre el supuesto registro inválido, es inmeritorio. Para comenzar, tenemos ante nos una situación de **<u>registro consentido</u>**, que es una de las excepciones a la garantía constitucional de que los registros se realizaran mediante orden judicial. El pasajero en este caso no se rehusó a abrir sus maletas cuando el agente de Rentas Internas se lo pidió. Ciertamente la situación en el caso de autos

se rige por nuestra decisión en <u>Pueblo en interés del menor N.O.R.,</u> *supra*. En dicho caso, un agente de seguridad le solicitó a un adolescente que se subiera la camisa, para comprobar su sospecha de que el menor estaba armado. El menor entonces cumplió parcialmente con lo solicitado y subió sus manos, lo que permitió que visualmente se efectuara un registro sobre la persona del menor. Resolvimos allí que el registro aludido era válido, aunque no había mediado una orden judicial. Señalamos que el menor N.O.R., al subir las manos sin objeción alguna, consintió tácitamente al registro sin orden. En dicho caso se trataba de un menor de edad, mientras que en el de autos el acusado era una persona de mayor edad que aquél, un joven de veintidós años de edad. En ninguna de las dos situaciones los agentes respectivos realizaron acto alguno de coacción. El incidente en el caso de autos también ocurrió en un lugar público y abierto. Vistas en conjunto la totalidad de las circunstancias, debemos concluir que el pasajero consintió voluntariamente al registro, tal como resolvimos con respecto al menor en <u>Pueblo en interés del menor N.O.R.,</u> *supra*.

Por otro lado, debe tenerse muy en cuenta que en el caso de autos el pasajero **<u>admitió que tenía droga ilícita en sus maletas</u>**, antes de que el agente de Rentas Internas le pidiese que las abriera. Esa admisión de actividad criminal es comparable a la situación en que un agente del orden público presencia un acto delictivo a simple vista, que es otra circunstancia en la cual procede el registro sin orden judicial. Son situaciones análogas porque en una y otra es patente que se está cometiendo un delito. En ambas es incuestionable la razonabilidad del registro sin orden. Por ello ya hemos resuelto que un agente del orden público puede proceder a arrestar sin orden judicial a una persona que ha hecho admisiones incriminatorias sobre la comisión de un delito, <u>Pueblo v. Alcalá Fernández </u>, 109 D.P.R. 326

(1980). Por idénticos fundamentos, debe resolverse ahora que procede el registro sin orden judicial de una maleta cuando su dueño le ha admitido a un agente del orden público que lleva material delictivo en dicha maleta.

Habiendo hecho una admisión incriminatoria sobre la comisión de un delito, el pasajero en el caso de autos no podía albergar una expectativa válida de intimidad con respecto a las maletas en las cuales portaba una droga ilícita. Pueblo v. Santiago Feliciano, *supra*.

**Por todas las razones y fundamentos señalados, es evidente que el registro del caso de autos fue razonable. Debe recordarse que "la protección que garantiza la Constitución no es contra la intromisión del Estado *per sé*, sino contra la que sea abusiva o irrazonable." Pueblo v. Santiago Feliciano, *supra*. Lo que evaluamos es la razonabilidad de la actuación gubernamental a la luz del fin legítimo que se persigue. Una vez el acusado admitió que llevaba marihuana, lo más razonable era que el agente le solicitara que abriera las maletas para corroborar si en efecto ello era verdad, lo que el acusado hizo voluntariamente. No hubo, pues, registro ilegal.**

Como en el caso de autos la mayoría "ve" actuaciones gubernamentales ilegales, donde ningunas existen realmente, yo disiento.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO